1  Frank Seddigh (SBN 289846)
   fs@sedbetter.com
2  Alicia M. Veglia (SBN 291070)
   av@sedbetter.com
3  SEDDIGH ARBETTER LLP
   626 Wilshire Blvd., Ste. 410
4  Los Angeles, CA 90017
   Tel (213) 816-0008
5  Fax (213) 816-0009
6
7  *Attorneys for Plaintiff*
   *Nader Filsoof*
8
9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11
12                                    | Case No. 2:25-cv-10823
13
14  NADER FILSOOF, an individual;     | **COMPLAINT FOR:**
                                        1. **VIOLATION OF THE**
15            Plaintiff,                  **FEDERAL RICO STATUTE,**
                                          **18 U.S.C. §§ 1962(c), 1964(c)**
16      vs.                             2. **VIOLATION OF THE**
                                          **FEDERAL RICO STATUTE,**
17  COORDINATED PROPERTIES, INC.;       **18 U.S.C. §§ 1962(a), 1964(c)**
    JOSHUA FILSOOF, individually and in 3. **VIOLATION OF THE**
18  his capacity as Trustee of the Filsoof  **FEDERAL RICO STATUTE,**
    Family Trust and as Executor of the    **18 U.S.C. §§ 1962(b), 1964(c)**
19  Estate of Fred Filsoof; RACHEL      4. **CONSPIRACY VIOLATION**
    FILSOOF; THE FILSOOF FAMILY           **OF THE FEDERAL RICO**
20  TRUST; TERASA FILSOOF; and           **STATUTE, 18 U.S.C. §§**
    DOES 1 through 20, inclusive,         **1962(d), 1964(c)**
21                                      5. **BREACH OF FIDUCIARY**
            Defendants.                   **DUTY / FREEZE OUT OF**
22                                        **MINORITY SHAREHOLDER**
                                        6. **BREACH OF FIDUCIARY**
23                                        **DUTY**
                                        7. **TORTIOUS INTERFERENCE**
24                                        **WITH A GIFT OR**
                                          **ECONOMIC EXPECTANCY**
25
26
27

                              1
_____
                        **COMPLAINT**

8. **STATUTORY RELIEF FOR MINORITY SHAREHOLDER OPPRESSION UNDER O.C.G.A. § 14-2-940(a)(1)**
9. **CONVERSION**
10. **CIVIL CONSPIRACY**
11. **RELIEF PERMITTING INSPECTION OF CORPORATE RECORDS**
12. **FRAUDULENT CONCEALMENT**
13. **CONSTRUCTIVE FRAUD (Cal. Civ. Code, § 1573)**
14. **ACCOUNTING**
15. **VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***
16. **UNJUST ENRICHMENT**
17. **BREACH OF CONTRACT**

**DEMAND FOR JURY TRIAL**

1.    Plaintiff Nader Filsoof brings this Complaint against Coordinated Properties, Inc., Joshua Filsoof, individually and in his capacity as Trustee of the Filsoof Family Trust and as Executor of the Estate of Fred Filsoof, Rachel Filsoof, the Filsoof Family Trust, Terasa Filsoof, and Does 1-20, and alleges as follows:

## INTRODUCTION

2.    Nader Filsoof is the de facto minority shareholder in a family-owned company, Coordinated Properties, Inc. ("CPI"), and the target of an ongoing scheme perpetrated by his stepmother and half-siblings to squeeze him out from his deceased father's company at a firesale price. Specifically, the majority shareholder bloc (consisting of his half-brother, Joshua Filsoof, and half-sister, Rachel Filsoof), Nader's stepmother (Terasa Filsoof), and CPI's Board of Directors have conspired to make it untenable for Nader to continue holding shares in CPI by intentionally

subjecting him to excessive pass-through tax liabilities while depriving him of any corporate distribution or payments that he could use to satisfy his tax obligations. Defendants have also sought to buy out his shares at a price substantially below fair-market value. In aid of this scheme, Defendants prepared a valuation that fraudulently undervalued Nader's stake in the company, and improperly denied Nader access to corporate books and records that would establish the true value of his shares.

3.      Nader brings this action to vindicate these injuries, which are unique to him and which no other CPI shareholder has borne. Accordingly, he brings a civil RICO action, along with various state-law claims, seeking damages. He also seeks equitable relief in the form of an accounting and an order from this Court allowing him to immediately inspect the corporate books and records as required under Georgia law.

## **PARTIES**

4.      Plaintiff Nader Filsoof ("Nader" or "Plaintiff") is a citizen of the State of California, residing at ██████████████████ Los Angeles, CA ████. At all times material hereto, Nader has been a shareholder of CPI. Currently, Nader owns 25% of the shares in CPI.

5.      Defendant Coordinated Properties, Inc. ("CPI") is a Georgia corporation with its principal place of business in Georgia, with a registered agent located at ██████████████ Atlanta, GA, ████.

6.      Defendant Joshua Filsoof ("Joshua") is a citizen of the State of New York, residing at ██████████████ New York City, New York, ████. At all times material hereto, Joshua was the President and Chief Executive Officer for CPI. Joshua individually owns 25% of the shares in CPI.

7.      Defendant Terasa Filsoof ("Terasa") is a citizen of either the State of Georgia, residing at ██████████████ Atlanta, GA, ████, or the State

3

_____
**COMPLAINT**

of New York, residing at ████████████████████, Manhattan, New York. At all times material hereto, Terasa was the Secretary of CPI.

8.    Defendant Rachel Filsoof ("Rachel") is a citizen either of the State of Georgia, residing at residing at ████████████████ Atlanta, GA, ████, or the State of New York, residing at ████████████████ Manhattan, New York. Rachel, individually, owns 25% of the shares in CPI.

9.    Defendant the Filsoof Family Trust owns 25% of the shares in CPI.

10.    Joshua Filsoof is the Trustee of the Filsoof Family Trust, and, as such, Joshua controls the Trust's 25% share.

11.    Nader is ignorant of the true names and capacities of the Defendants named herein as Does 1 through 20, inclusive. Nader is informed and believes, and thereon alleges, that Does 1 through 20 are liable, in whole or in part, for the claims asserted in this Complaint against the Defendants. Nader alleges that the Does include the directors of CPI (collectively, the "Board"), as well as the trustee(s) of the Nader Trusts (hereinafter defined), as well as other persons not currently known to Plaintiff. Due to the other Defendants' complete refusal to provide Nader with corporate documents or records, their identity is currently unknown to Nader. When Nader learns the true identities and capacities of Does 1 through 20, he will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 20.

12.    At all times material to the allegations herein each Defendant was an agent and/or employee of each of the remaining Defendants, and in doing the acts alleged herein, each of the Defendants was acting within the course and scope of such agency or employment and with the permission and consent of the other Defendants. Nader is further informed and believes that in doing the acts alleged herein, each of the Defendants was acting in concert with each of the other Defendants.

**COMPLAINT**

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendants, who have sufficient minimum contacts with this jurisdiction. On information and belief, Defendants regularly travel to and conduct business in this District and purposefully avail themselves of the benefits of this District. In addition, Defendants committed intentional acts directly aimed and targeted at Nader, a California resident. At all relevant times, Nader has been a California resident, and Defendants were aware of Nader's California residency. Defendants' intentional acts were expressly aimed at Nader, a California resident, intended to cause Nader harm, and Nader suffered harm in California, in this District. Defendants knew or should have known that their actions would cause Nader harm in California, and it was reasonably foreseeable that such harm would be suffered in California. Indeed, Defendants acts targeted Nader, and no other shareholder of CPI, and were clearly intentionally directed at Nader in California. Thus, the Court has personal jurisdiction over Defendants. *Calder v. Jones*, 465 U.S. 783, 789 (1984).

14.     Additionally, Defendants have transacted business, including but not limited to buying and selling real property, in this District. Public records reveal that CPI and the Filsoof Family Trust have bought and sold property in this District. Defendant Rachel Filsoof regularly conducts business in this District due to her work in the entertainment industry, and, on information and belief, the remaining Defendants also regularly travel to and conduct business in this District multiple times per year, and elsewhere in the State of California. Defendants have therefore purposefully availed themselves of the benefits of transacting business in this State and District. Defendants have sufficient contacts with the State of California, and this District, such that exercise of jurisdiction over them comports with principles of fair play and substantial justice. Jurisdiction is therefore appropriate over

**COMPLAINT**

1    Defendants pursuant to California Code of Civil Procedure section 410.10 and the
2    Fourteenth Amendment of the United States Constitution.

3          15.    Subject-matter jurisdiction is proper in this Court pursuant to 28 U.S.C.
4    § 1331 because this case arises under a federal law, specifically, the federal civil
5    RICO Act (18 U.S.C. § 1964).

6          16.    Subject-matter jurisdiction is also appropriate under 28 U.S.C. § 1332
7    because this case is between citizens of different states and the amount in
8    controversy exceeds $75,000, exclusive of interest and costs.

9          17.    This Court has supplemental jurisdiction over Nader's state law claims
10   pursuant to 28 U.S.C. § 1367(a). The federal and state claims alleged herein are so
11   related that they form part of the same case or controversy.

12         18.    Venue is proper under 28 U.S.C. 1391(b)(2) because a substantial part
13   of the events or omissions giving rise to the claims  herein  arose  in this District.
14   Nader felt harm in this District as a result of Defendants' actions, and conducted his
15   dealings with Defendants, including sending requests for books and records
16   inspections, from this District. Defendants also targeted Nader in this District.

17         19.    As to Defendants CPI and the Filsoof Family Trust, venue is also
18   proper in this District under 28 U.S.C. § 1391(b)(1) because such entity Defendants
19   are deemed to reside in California where the Court has found that has personal
20   jurisdiction over such Defendants. 28 U.S.C. § 1391(c)(2). Thus, since the Court
21   has personal jurisdiction over these Defendants, venue is also proper here.

22         20.    Venue is also proper in this judicial district pursuant to 18 U.S.C. §
23   1965(a), (b), and (d) because one or more of the defendants transact their affairs
24   within this district and because the ends of justice will be met by laying venue in
25   this district.

26         21.    Defendants have engaged in a multidistrict pattern of racketeering
27   activities and a conspiracy to engage in these racketeering activities. The ends of

_____
**COMPLAINT**

justice therefore require allowing all members of this conspiracy to be brought before a single court. Because this Court has personal jurisdiction over at least one member of the conspiracy, if not all members, personal jurisdiction over Defendants is proper pursuant to 18 U.S.C. § 1965(b).

## FACTUAL ALLEGATIONS

### *The formation of CPI and Fred Filsoof's death*

22.     CPI is a closely held corporation, formed by Fred Filsoof in 1974, before Nader was born.

23.     CPI is a real estate holding company. It regularly conducts multi-million-dollar real estate transactions, resulting in millions of dollars in profits to the company.

24.     CPI is an "S corporation," which means that corporate income, losses, deductions, and credits are "passed through" to its shareholders for tax purposes.

25.     During his life, Fred acted as President and Chief Executive Officer ("CEO") of CPI.

26.     Fred Filsoof also formed a number of other entities during his lifetime, the majority of which he was the sole owner and/or operator. In regards to three such entities in particular, Fred Filsoof also engaged in significant related party transactions involving CPI and asset transfers. These entities are Coordinated Capital Credit Company, a Georgia corporation ("Coordinated Capital"); Laurelbrook, Inc., a Georgia corporation ("Laurelbrook"); and Sherkat Nafis Company, LLC, a Georgia limited liability company which is an agent for Sherkat Nafis Trust Company, LTD., an Irish company (Sherkat Nafis Company, LLC and Sherkat Nafis Trust Company, LTD. are referred to herein, collectively, as "Sherkat Nafis"). CPI was always the nucleus where the income was generated, while these other entities were created for purposes of moving income generated by CPI between or among such entities, as well as for creating tax shelters. For example,

_____
**COMPLAINT**

each property that CPI bought or developed typically had its own entity. When the property was sold and generated gains, Fred would often request that his children contribute the gains to CPI and then receive distributions through CPI, since CPI was able to offset gains with losses and reduce tax burdens. CPI would also pay certain entities, or make loans to or from certain entities, including but not limited to Coordinated Capital, Laurelbrook and Sherkat Nafis as a way to move money out of CPI and redirect it to these other entities, which would then use the money for Fred's or his family's personal use. However, those entities were merely shells and did not have any business operations or generate any income, other than what they received from CPI. On information and belief, Defendants have continued to engage in such transactions and have therefore wrongfully diverted income and property belonging to CPI to these other entities, which Nader has no ownership interest in, as a means of further denying Nader distributions, dividends, income, and property owed to him as a shareholder of CPI. Instead, Defendants have used these assets that rightfully belong to CPI to fund their lavish lifestyle and personal expenses, and have attempted to hide such transactions by using these shell entities to route money or assets through as intermediaries.

27.    Joshua Filsoof is currently the CEO and CFO of Coordinated Capital, and Terasa Filsoof is the Secretary.

28.    Joshua Filsoof is currently the CEO and CFO of Laurelbrook, and Terasa Filsoof is the Secretary.

29.    Joshua Filsoof is currently the registered agent and manager of Sherkat Nafis.

30.    Fred Filsoof also regularly comingled his business and personal assets. For example, Nader regularly received payments from Sherkat Nafis to cover Nader's living expenses. Rachel, Joshua, and Terasa likewise received such payments from Sherkat Nafis to cover their personal living expenses before Fred's

COMPLAINT

death. After Fred's death, all such payments to Nader were stopped by Defendants, but Joshua, Rachel, and Terasa have continued to receive such payments for themselves.

31.    Fred also formed the Filsoof Family Trust, of which he was the Trustee. This trust was created following Fred's divorce from Nader and David's mother for the benefit of Fred, Nader and David. Fred later added Rachel, Joshua and Terasa to this trust to benefit everyone equally.

32.    Fred Filsoof had two sons with his first wife: Nader and David. Fred later remarried Terasa and had two children with her: Joshua and Rachel.

33.    While Fred was alive, Fred's four children (Nader, David Filsoof (Nader's full-blood brother), Defendant Joshua Filsoof (Nader's half-brother), and Defendant Rachel Filsoof (Nader's half-sister)) and the Filsoof Family Trust each owned an equal 20% stake in CPI.

34.    In 1983, Fred Filsoof also created the David Filsoof and Nader Filsoof Trust ("1983 Nader Trust"), for the benefit of Nader and his brother David Filsoof. Fred Filsoof also established a trust for Nader and David in 1989 ("1989 Nader Trust") and a Fred F. Filsoof Irrevocable Trust dated June 1, 1983, of which Nader and David were beneficiaries ("Filsoof Trust", and together with the 1983 Nader Trust and 1989 Nader Trust, the "Nader Trusts"). The Nader Trusts were formed following the divorce of Fred from Nader and David's mother for the benefit of Nader and Fred. Until his death in 2019, on information and belief, Fred Filsoof was the Trustee of the Nader Trusts. Shortly after Fred Filsoof's death, Joshua Filsoof took all of the documents that Fred Filsoof possessed related to the Nader Trusts and refused to turn them over to Plaintiff or David Filsoof. Despite numerous requests for these documents from Plaintiff, Joshua continues to wrongfully withhold such documents, thereby preventing Plaintiff from accessing his rightful property in the Nader Trusts. On information and belief, Joshua Filsoof has also

**COMPLAINT**

hidden and/or transferred property out of the Nader Trusts, without any authority to do so, and such property rightfully belongs to Plaintiff.

35.    Indeed, Plaintiff later found out that the trustee(s) of the Nader Trusts comingled funds of the Nader Trusts with other personal and/or business funds, used money and property belonging to the Nader Trusts to purchase a condominium in New York located at 30 Little West Street, Unit 24G, Manhattan, New York ("NY Condo") which was not properly titled in the name of the Nader Trusts, diverted rental income of at least $6,500 per month from the NY Condo (which properly belongs to the Nader Trusts) to other persons and/or entities including but not limited to Joshua Filsoof, Terasa Filsoof, Rachel Filsoof and/or the Filsoof Family Trust, refused to retitle the NY Condo in the name of the Nader Trusts or pay the rental income to the Nader Trusts, despite requests for the same, and refused to provide Plaintiff with all documents and accountings related to the Nader Trusts.

36.    The NY Condo is titled in the name of the Fred F. Filsoof Trust dated 6/1/1987. During his life, Fred Filsoof repeatedly told Nader and David that he purchased the NY Condo for Nader and David, and bought another unit in the same building (unit 25G) for Terasa, Joshua and Rachel. Documentary evidence establishes that Fred purchased the NY Condo using funds from the Nader Trusts. It is unclear whether Nader and/or David are beneficiaries of the Fred F. Filsoof Trust dated 6/1/1987, which holds title to the NY Condo, since Joshua took all of Fred's personal documents, including all trust documents, after Fred's death into his own possession, and refused to turn over any such documents to Nader or David. If Nader and/or David are beneficiaries of the Fred F. Filsoof Trust dated 6/1/1987, then Joshua's refusal to turn over such documents, diversion of rental income, and assertion of dominion over the NY Condo are even clearer cases of conversion. However, even if Nader and David are not beneficiaries of the Fred F. Filsoof Trust dated 6/1/1987, Defendants have still wrongfully taken ownership of the NY Condo,

**COMPLAINT**

as it was purchased with funds from the Nader Trusts and must be re-titled in favor of Plaintiff and David, consistent with Fred's promises regarding ownership of the NY Condo, and their acts nevertheless constitute conversion.

37.     During his life, Fred always ensured that the company made sufficient distributions to the family members who owned its stock, including Nader, to cover any individual tax liability incurred due to CPI's "S"-corporation status.

38.     In addition, because minimizing the out-of-pocket tax liabilities of its shareholders was a priority for Fred, transactions were structured in a way to minimize tax obligations.

39.     Thus, before 2019, all shareholders, including Nader, were given sufficient distributions to cover any pass-through tax liability, and all shareholders were treated equally.

40.     Even before Fred's death, Terasa worked to create a rift between Fred and his two eldest sons, the aim of which was to funnel more wealth to her own two children, at the expense of her step-sons. Part of Terasa's plan was to cut David and Nader out of CPI. Thus, there has been a feeling of mutual distrust and "bad blood" between the two sides of the family for years, which has only grown worse over time. Indeed, Terasa drafted emails which she then sent from Fred's email account (which she had access to and even controlled) to Nader and David purporting to disown them as Fred's children.

41.     In or around 2017, Fred Filsoof became very ill, and was diagnosed with multiple brain tumors. Fred lost partial vision in both of his eyes, and was on heavy medication and steroids. He also had gout which made it very difficult for him to move and walk at times. Around that time, Fred Filsoof was undergoing surgeries related to his condition, and was in a feeble state.

42.     While Fred was in and out of surgeries in 2017, and when he was very ill, Nader and David attempted to call and visit him. Terasa and Joshua Filsoof took

physical possession of Fred's phone and would not allow any calls made by Nader or David to go through to Fred. Terasa and Joshua also had control of Fred's email and text messages, so Nader and David had no way to contact their father or have any privacy in their conversations with him. When Nader or David called the hospital, they were informed that Terasa and Joshua have denied the request to speak to him or provide any information on how to visit him.

43.    Terasa and Joshua also prevented Nader and David from physically visiting Fred. They were able to accomplish this because they lived with Fred at the time and had the ability to prevent David and Nader from entering the property, hotel room and/or the hospital room where he was, and refused to tell Nader and David where Fred was. Terasa and Joshua used their total control over Fred to manipulate him.

44.    While Fred's health was getting even worse, Terasa and Joshua then proceeded to perpetrate a fraud upon Fred, falsely telling him that Nader and David had never called while Fred was undergoing surgeries, and falsely stating that Nader and David were "waiting for Fred to die" so that they could get all of his money. Terasa and Joshua made repeated false statements to this effect, knowing that they were false, in order to anger, upset and pressure Fred into creating a new will that would cut Nader and David out of his will which—up until 2017—treated them all equally.

45.    The will that existed before the 2017 will treated all of Fred's children, including Nader and David, equally. Although Nader does not have a copy of the pre-2017 will, he has seen it and can confirm that it did in fact treat all of Fred's heirs equally.

46.    Eventually, Fred fell victim to the fraud perpetrated by Terasa and Joshua upon him, and in his feeble state, executed a new will in 2017 that indeed cut Nader and David out of his will, except for the payment of $1 million each that

_____
**COMPLAINT**

1   would only be transferred if Nader and David complied with an in terrorem clause

2   in the will. Joshua and Terasa also fraudulently pressured Fred into including the in

3   terrorem clause in the will in order to frustrate Nader and David's ability to

4   challenge the will. The new will also named Joshua as executor of Fred's estate.

5        47.    Joshua and Terasa also convinced Fred to remove Nader and David as

6   beneficiaries of the Filsoof Family Trust in 2017, which he did, based upon their

7   fraudulent misstatements about Nader and David. Prior to such amendments in

8   2017, Nader and David were equal beneficiaries of the Filsoof Family Trust.

9        48.    After Fred recovered from his 2017 surgery, in late 2017 or early 2018,

10  and was in better health, both physically and mentally, Fred reconciled with his

11  sons, Nader and David, and remained close with them until his death.

12       49.    Fred Filsoof was scheduled to have another surgery on or around

13  November 21, 2019.

14       50.    A few days before his scheduled surgery in November 2019, Fred,

15  Nader, and Fred's cousin and his partner, had dinner together in Los Angeles, CA.

16  By this time, Fred had reconciled with Nader and David. During this dinner, Fred

17  explained to Nader that he created a will in 2017 which essentially removed Nader

18  and David from his will and that he also removed them from the Filsoof Family

19  Trust in 2017. Fred stated that he felt guilty about removing them from his will and

20  the trust in 2017, and that he loved all of his children equally. Fred explained that

21  in 2019 he again modified his will to essentially void the 2017 will, so that each of

22  his children would receive 20% of his estate, and his wife Terasa would receive the

23  remaining 20%.

24       51.    Fred also explained that although he removed Nader and David from

25  the Filsoof Family Trust in 2017, he changed his mind and added them back to the

26  Filsoof Family Trust as beneficiaries in 2019. He stated that he wanted all his

27  children to have equal shares of his estate to avoid confrontation when he passed.

_____
**COMPLAINT**

52.     Fred further told Nader and David that he wanted David and Joshua to be Co-Presidents of CPI after he passed. Indeed, during his life, Fred always made a point of treating his children equally. For example, when Fred bought the NY Condo for Nader and David, he bought an identical one in the same building for Rachel and Joshua. He also made all the children equal shareholders in CPI, and made them equal participants in distributions from CPI during his lifetime.

53.     Around this time in late 2019, Fred told other third parties that he had included Nader and David in the Filsoof Family Trust, and his will, so that all beneficiaries were treated equally. For example, Fred made statements to Nader's girlfriend's parents at another dinner in Los Angeles in November 2019 to the effect that he had made all of his children equal in his estate and trust, and made similar statements to multiple other third parties as well. Terasa and Rachel were present at this dinner and heard Fred making these statements.

54.     Terasa, Rachel and Joshua were aware of this new will and that Nader and David had been added back to the Filsoof Family Trust in 2019.

55.     In 2019, Fred also told Nader that he was concerned that Terasa would find a way to "screw over" Nader and David if he died, and thus Fred wanted to purchase Nader's 20% stake in CPI before he died. Fred told Nader this during their last in person meeting before Fred's death.

56.     During that same conversation, Fred told Nader that he wanted to buy out Nader's then 20% stake in the company for $20 million, which Fred believed to be a fair valuation, in order to prevent Terasa, Joshua and Rachel from attempting to "screw over" Nader and David in the event Fred passed. That transaction never occurred due to Fred's passing.

57.     Unfortunately, Fred Filsoof never woke up from his surgery, and passed away as a result, on or around November 26, 2019.

_____
**COMPLAINT**

58.    After Fred's passing, Nader was presented with the 2017 will and testament of Fred Filsoof that purported to cut Nader and David out of the will and remove them from the Filsoof Family Trust, except for the receipt of $1 million each, as the governing will. Since Nader and David already had direct ownership of their shares in CPI at the time of Fred's death, Fred's will did not affect their ownership of CPI shares.

59.    This came as a shock to Nader, who understood that Fred had drafted a new will in 2019 which treated all beneficiaries, including Nader and David, equally, and that Nader and David had also been added back to the Filsoof Family Trust as equal beneficiaries in 2019, which replaced the 2017 will that Joshua and Terasa fraudulently convinced Fred to execute by preying on his weak condition and enraging him with lies about his sons. However, Nader did not have possession of any of Fred's estate documents, including the 2019 will or trust amendment. All such documents were under the sole control of Joshua, Rachel, and Terasa Filsoof.

60.    After Fred's death, Nader asked for and requested documentation of the 2019 will and 2019 amendment to the Filsoof Family Trust. All such requests were denied, and Joshua told Nader that no such 2019 will or amendment to the Filsoof Family Trust ever existed. These statements were false.

61.    In or around December 2021, Nader learned from a third party that Joshua, Terasa, and Rachel had all destroyed the will and trust documents executed by Fred Filsoof in 2019 which left equal shares of Fred's estate and in the Filsoof Family Trust to Nader, David, Joshua, Rachel and Terasa. The third party confirmed that Joshua, Terasa and Rachel expressly told him (orally) that they had destroyed those documents for the purpose of cutting Nader and David out of their inheritance from Fred, thereby increasing their own shares of such inheritance.

62.    After destroying the 2019 will and trust amendment, Joshua, as Executor of Fred's estate, presented the invalid 2017 will as the final will and

_____
**COMPLAINT**

1    testament of Fred Filsoof, and the estate was administered in probate on the 2017

2    will. This constituted a fraud upon the court.

3       63.    By destroying the 2019 will and falsely proceeding on the 2017 will as

4    valid, Joshua, Terasa and Rachel Filsoof fraudulently diverted Nader's rightful

5    inheritance (20% of Fred's estate and 20% interest in the Filsoof Family Trust) to

6    themselves.

7       64.    In conversations with Fred Filsoof shortly before his death, he

8    estimated that his estate was worth approximately $50-60 million, not including any

9    stock in CPI. However, because most of the assets were in trust, and Defendants

10    presented documents in probate that purported to show that Nader was not a

11    beneficiary of the trust(s), Nader was not privy to the valuation of those assets.

12    However, based on Fred's representations as to the value of his estate (including

13    assets held in the Filsoof Family Trust) Nader's rightful 20% share should have

14    been worth at least approximately $10-12 million, excluding the value of his shares

15    in CPI.

16       65.    Upon Fred's death, Joshua became President and CEO and CFO of

17    CPI, with Terasa serving as CPI's Secretary.

18       66.    After Fred's death, Joshua also became Trustee of the Filsoof Family

19    Trust, which contained the majority of Fred's assets.

20       67.    Upon information and belief, Terasa, Joshua and Rachel are the

21    beneficiaries of the Filsoof Family Trust pursuant to the 2017 amendments that

22    wrongfully removed Nader and David.

23       68.    Nader was always a beneficiary of the Filsoof Family Trust until Fred

24    Filsoof changed his will shortly before his death. While he was very ill, Fred Filsoof,

25    acting under pressure from Joshua, Terasa, and Rachel, changed his will in order to

26    remove Nader and David as beneficiaries of the Filsoof Family Trust. Nader did not

27    learn of any such change until after his father's death. Plaintiff alleges that Fred

**COMPLAINT**

1    Filsoof was not of sound mind when he changed his will, and that such change was

2    the result of undue influence by Joshua, Terasa and Rachel.

3        69.    On November 29, 2019, the evening of Fred's funeral, Terasa, Rachel,

4    and Joshua cornered Nader and demanded to know what he thought he was

5    monetarily "entitled to" as a result of Fred's death. Nader stated that he wanted

6    Fred's wishes to be honored, whereby everyone was treated equally. Nader then

7    stated that he was not comfortable having this discussion on the night of his funeral,

8    and left.

9        70.    In another conversation shortly thereafter, Ivan Millender, a longtime

10   family attorney, who was aware of the longstanding animosity among the two sides

11   of the family, suggested a buyout of the shares held by Nader and his brother, David.

12       ***The majority bloc begins its scheme to oppress and squeeze out Nader***

13       71.    After Fred's death, Joshua, with the Board, Terasa, and Rachel's full

14   knowledge, consent, and participation, embarked on a strategy to force his half-

15   brothers to give up their shares in CPI at a fire-sale price.

16       72.    Joshua requested that a third party, Bennett Thrasher, perform a

17   valuation of Nader's 20% stake in the company.

18       73.    On November 30, 2021, Joshua received that valuation report from

19   Bennett Thrasher (the "Bennett Thrasher Report").

20       74.    The cover letter for the Bennett Thrasher Report stated that it was

21   prepared at Joshua's request with the understanding that the valuation would be

22   "used in connection with your contemplated purchase of the Interest in the

23   Company held by the other owners, your siblings."

24       75.    The cover letter for the Bennett Thrasher Report also stated that, in

25   reaching its valuation, Bennett Thrasher relied on financial statements and other

26   information provided by company representatives.

27

_____
**COMPLAINT**

76.     On information and belief, Joshua and/or Terasa Filsoof, as corporate officers of CPI, and/or Michael Marks, CPI's then-Treasurer and a longtime family accountant, provided Bennett Thrasher with incomplete or inaccurate financial information, leading to an undervalued computation of share value.

77.     In addition, when Nader's independent professionals analyzed the Bennett Thrasher valuation, they discovered that the property appraisals relied upon by Bennett Thrasher severely undervalued CPI's property portfolio.

78.     On December 2, 2021, Joshua Filsoof, sent an email directly to Nader, copying Ivan Millender and Michael Marks, offering to buy out Nader's 20% share of CPI.

79.     The December 2, 2021 email attached the Bennett Thrasher Report, which calculated an unsubstantiated and devalued value for 20% of the company, and the Report then further "discounted" the already undervalued amount by 10% for lack of control and an additional 25% for lack of marketability – essentially, a 35% minority shareholder discount on top of the already undervalued estimate, thereby grossly undervaluing Nader's shares.[1]

80.     The December 2, 2021, email offered Nader an amount reflecting the same amount in the Bennett Thrasher report, including the 35% discount.

81.     In the December 2 email, Joshua warned Nader that it was possible that Congress would increase the capital gains tax rate in 2022, pressuring him to accept the offer by the end of the year to avoid that rate hike.

82.     Joshua also touted the purported favorability of the offer, stating that the appraised value was "very favorable" to Nader because it "discounts the

---

[1] The precise valuation numbers have not been alleged in this publicly filed complaint due to a Non-Disclosure Agreement that Joshua insisted Nader sign before he could receive the Bennett Thrasher Report and valuation.

**COMPLAINT**

extensive loans currently outstanding and payable by the Company to Fred Filsoof's estate" and touting the "incredibly thorough" valuation done by Bennett Thrasher.

83.    But the buyout offer significantly undervalued Nader's shares, and was offered with the intention of squeezing Nader out of the company at an unfairly discounted price, to the benefit of the majority bloc. Not only that, the "loans" to the estate were self-interested and/or fraudulent transactions, representing purported "loans" to themselves which served no purpose other than to devalue the shares of CPI.

84.    Joshua and Millender, as attorneys, knew or should have known that Georgia law disfavors the application of minority interest discounts. *See Wallace v. Wallace,* 345 Ga. App. 764, 774 (2018).

85.    Joshua, Millender, Marks, Terasa, and Rachel, and any other members of the Board also knew or should have known that the offer severely undervalued Nader's interests in CPI because of the incorrect financial statements shared with Bennett Thrasher and/or the undervalued property appraisals.

### Joshua refuses to let Nader inspect the corporate books and records to perform an independent valuation of the offer

86.    Nader suspected that the December 2, 2021 buyout offer substantially undervalued his shares. This was based on the fact that, in 2019, before his death, Fred Filsoof advised Nader that his 20% interest in CPI was worth approximately $20 million, as well as Nader's general understanding of the business of CPI, a real estate investment firm. Between 2019 and 2021, the United States was experiencing what has become known as the "Pandemic Housing Boom", whereby housing market prices experienced unprecedented growth, and the value of the U.S. housing market increased from $26.1 trillion in February 2019 to $33.4 trillion dollars in February 2021.[2]  Atlanta, GA, where most of CPI's real estate holdings are located,

---

[2] *See, e.g.*, Lily Katz, *Jacksonville, Austin and Charlotte Led 13% Surge In Total U.S. Housing Market Value During Pandemic*, Redfin (March 11, 2021), *available at*

**COMPLAINT**

was one of the top growing areas for real estate, with 11.6% year over year increase in total home values from 2020 to 2021, and a 14.3% year over year increase in median sale prices.[3] Thus, Nader's shares should have been worth significantly more than $20 million in 2021 compared to 2019—not significantly less, as proposed by Joshua Filsoof. Further, once Nader's percentage ownership of CPI increased from 20% to 25% in 2022 (as described below), it was worth even more. Not only that, the valuation did not account for all of the cash, stocks and other investments that CPI had as well.

87.    On December 3, 2021, Nader responded to Joshua via email, explaining that in order to properly evaluate the offer with his lawyer and accountant, he would need additional information, including CPI's financial records.

88.    Joshua responded to Nader via email later that day, refusing to provide any additional information or documentation beyond what was relied on by Bennett Thrasher in preparing their valuation.

89.    In his December 3, 2021, email, Joshua stated that the offer was "not subject to negotiation." Joshua told Nader that if Nader thought the offer undervalued his shares, he could decline the offer or he could "market and sell his shares to a third-party," despite Joshua knowing that a 20% share in a closely-held, family corporation was not marketable.

90.    On a December 7, 2021, phone call, Joshua admitted to Nader and David that the amount offered reflected a minority shareholder discount.

---

https://www.redfin.com/news/real-estate-home-value-pandemic-february-2021/#:~:text=The%20result%20is%20skyrocketing%20home%20values%E2%80%94a%20benefit,2021%20from%20$29.4%20trillion%20in%20February%202020 (last accessed September 12, 2025).

[3] *Id.*

**COMPLAINT**

91.    On that December 7 call, when Nader offered to buy out Joshua's shares at the same price, Joshua balked, explaining that he was not a minority shareholder, and told Nader that – because he (Joshua) controlled three out of the five shareholder votes, Nader would never hold any power within CPI. Joshua further told Nader that because CPI is a closely held, private corporation, he would never be able to sell his shares on the open market, and Joshua once again touted the "fairness" of the offer and told Nader it was the best one he was going to get.

92.    But the statements made by Joshua Filsoof regarding the accuracy of the buyout offer amount, the existence and/or amount of the minority shareholder discount, and the purported thoroughness and accuracy of the Bennett Thrasher Report were incorrect and, indeed, were fabricated by Joshua Filsoof as part of his bid to extort and defraud Nader, and Joshua Filsoof made these misrepresentations knowing they were false.

93.    The Board, Rachel Filsoof, and Terasa Filsoof had full knowledge of the false nature of Joshua's statements and consented to and participated in the scheme to eject Nader from the company at a fire-sale price.

94.    On January 11, 2022, Nader, via his attorney, demanded to inspect CPI's corporate books and records, as is his right under O.C.G.A. § 14-2-1602. The demand was made in writing and sent to John Christy, CPI's attorney. In that letter, Nader's attorney listed several discrepancies or suspicious items in the outstanding buyout offer, including independent property appraisals showing that the appraisals from the Bennett Thrasher Report were undervalued by nearly $1 million; property that appears to have been shifted to a company also owned or controlled by members of the majority bloc for zero consideration; CPI's refusal to provide to Nader its tax returns or even Nader's own share certificates; and the fact that CPI apparently had several loans owing to shareholders or their trusts, with no supporting underlying loan documents.

_____
**COMPLAINT**

95.     Attached to that January 11, 2022, letter were requests for specific company documents, most of which had been used by Bennett Thrasher in compiling its Report.

96.     Despite his earlier statement to Nader that CPI would provide the documents relied upon by Bennett Thrasher, CPI, acting on Joshua's instructions, refused to provide Nader with any of those documents.

97.     Joshua and Nader continued to negotiate the buyout in January 2022, and in a January 18, 2022, email, Joshua offered to pay Nader millions of dollars more for his shares if the buyout were structured over time.

98.     Unable to determine whether the buyout offer was a fair valuation of his share in the company, and now realizing that the offer was part of a scheme to force him out of the company at a fire sale price, Nader refused the offer.

99.     But David, Nader's brother, succumbed and sold his 20% stake in CPI, in reliance upon the valuation and financial statements in the Bennett Thrasher report.

100.    After Nader refused the buyout, Joshua told David that he was going to "punish" Nader.

101.    Upon David's sale of his interest in the company, Nader, Joshua, Rachel, and the Filsoof Family Trust each owned 25% of CPI's shares.

***The majority bloc and Board of Directors refuse to make any corporate distributions to Nader to cover his pass-through tax liability***

102.    In 2021, Joshua caused CPI to sell a parcel of property in Forsyth County, Georgia for more than $11 million.

103.    Unlike in past years CPI leadership made no efforts to arrange for the sale proceeds to be reinvested in a way to minimize pass-through taxes, generating a large tax liability for CPI which was then passed through to its shareholders.

_____
**COMPLAINT**

104.   For the first time, CPI—under Joshua's direction—refused to cover Nader's pass-through tax liability on the income from the sale of this property. This decision was made not for any business purpose but to deliberately harm Nader and attempt to extort him.

105.   Specifically, Nader was listed as a witness for Andrew Cole in a case filed by Rachel Filsoof against Andrew Cole in the Southern District of New York, Case Number 1:21CV01791 alleging that Cole attacked and/or stalked her (the "NY Lawsuit"). Rachel Filsoof subpoenaed Nader, and her counsel took his deposition on June 1, 2022. Joshua told Nader's brother, David, that if Nader provided damaging testimony or evidence that would harm Rachel's case, that he would be punished and that Joshua would "screw him over on the taxes", or words to that effect. During his deposition on June 1, 2022, Nader testified truthfully, which included some testimony questioning the character of Rachel, Terasa, and Joshua that did not support Rachel's case. Nader testified that he was "painting a target on [his] back" and that he expected to "feel the wrath of that family," as a result of his testimony but complied with his duty to tell the truth.

106.   On October 14, 2022, Michael Marks sent Nader a K-1 notice that he would face an approximately $720,000 tax liability (state and federal) for the 2021 tax year, most of which was due to the income generated from the sale of the Forsyth County property. Notably, the K-1 was dated September 18, 2022, but it was not sent to Nader until October 14, 2022 in order to put even more pressure on Nader by having less advance notice of his tax liability. The notice stated that the full amount was due immediately, or else Nader would face "over $30k a month in penalties". Despite the fact that Nader had been asking about his tax liability for months, Defendants purposefully waited until the last possible moment—after Nader has testified unfavorably to Rachel in the NY Lawsuit—to inform him that

_____
**COMPLAINT**

1  he was subject to a massive tax liability that CPI would not provide him with
2  customary distributions to cover.

3     107.   The next day, October 15, 2022, Nader emailed Joshua to inquire when
4  he would receive a distribution from CPI to cover his tax liabilities, as he had
5  received every previous year.

6     108.   Joshua responded to Nader via email two days later, stating that the
7  Board had determined that CPI was "unable" to make any corporate distributions
8  that year, and that covering the pass-through taxes would be each shareholder's
9  personal responsibility.

10    109.   Although Nader had been asking about the taxes and distributions for
11 months, this was the first time Nader was informed that CPI would not be providing
12 him any distributions, and the first year in the history of CPI that this had *ever*
13 occurred.

14    110.   Joshua, with the knowledge, consent, and participation of the other
15 members of the majority bloc, other corporate officers of CPI, and the Board,
16 decided to specifically deny Nader any corporate distributions from CPI, knowing
17 that it would place him in an unexpected financial bind. In particular, Defendants
18 were aware that Nader was a salaried employee making approximately $100,000
19 per year at the time and had no way to afford such tax liability.

20    111.   On information and belief, from 2021 to the present, CPI has continued
21 to provide sufficient distributions, dividends, salaries, tax write-offs, or similar
22 mechanisms to cover the pass-through tax liabilities of Joshua, Rachel, and the
23 Filsoof Family Trust, ensuring that the majority bloc is insulated and protected from
24 the scheme to squeeze out Nader, while Joshua, Rachel and Terasa continue to run
25 their own personal expenses through the CPI.

26    112.   Nader holds shares with equal rights and privileges as those held by
27 the majority bloc and yet he was the only shareholder targeted for this financial

_____
**COMPLAINT**

squeeze caused by CPI's refusal to provide funds to cover his pass-through tax liabilities.

113.    Nader has not received any corporate distributions from CPI from tax year 2021 to the present.

114.    Yet, as a CPI shareholder, he has continued to accrue tax liabilities passed through from CPI, and, as a result, faces approximately $1 million in personal federal and state tax liability from unpaid pass-through taxes, which is inclusive of interest, fees, and penalties.

115.    For a period of time, Nader's wages were garnished as a result of his tax liability.

116.    Nader has retained counsel to obtain relief related to Defendants' issuance of fraudulent and/or erroneous tax schedules to the IRS, and has paid substantial fees for tax counsel and CPA to amend returns. As a result of the efforts of Nader's tax counsel, the IRS has reversed Nader's federal tax liability that was fraudulently reported by CPI to freeze out Nader by weaponizing phony tax schedules and misreporting income attributable to CPI. However, the IRS has not removed any of the liens and levies currently pending against Nader, which are for the full amount of taxes owed, and total approximately $1 million.  Nader's state taxes still reflect CPI's erroneously filed Federal schedules and he continues to suffer as a result of state taxes which remain unadjusted notwithstanding the temporary relief that Nader has received from the IRS.

117.    This is a continuing harm which Nader will suffer year after year. Indeed, as recently as September 5, 2025, Nader received a new tax bill from the State of Georgia, claiming a balance owed of $154,333.25 related to his ownership of stock in CPI. The State of Georgia has refused to reduce the amount of Nader's tax liability despite his challenges thereto.

_____
**COMPLAINT**

118.   On or around September 20, 2025, Nader received his 2024 K-1 from CPI, dated September 12, 2025,which noted that Nader's share of ordinary dividends was $177,106, interest income was $31,644, and qualified dividends was $64,864. However, CPI has not paid Nader any of these amounts. The K-1 also reflects purported "shareholder loans" of over $4.3 million. Nader has never made any such loans to CPI, and, on information and belief, Defendants have booked fraudulent shareholder loans as a way of showing that CPI has more debt in order to devalue Nader's shares in CPI and justify their lowball offer for his shares. Notably, the 2022 K-1 from CPI to Nader reflects $0 in "shareholder loans," and then the 2023 K-1 from CPI reflects more than $4.3 million in "shareholder loans" that are not substantiated, and which Nader has no knowledge of, and those purported loans continue to be reflected on the 2024 K-1.

119.   Nader has also suffered harm to the extent he has been denied loans to purchase a home and/or other forms of credit as a result of the tax liens against him.

120.   CPI's scheme to defraud Nader and "freeze" him out as described above, consisted of a seldomly used tactic of issuing fraudulent IRS forms in order to destroy the value of an unwanted minority shareholder's interests to force him out for a cheap price and weaponize that shareholder's inflated tax liability to deteriorate share value.  As also described above, Nader retained tax counsel in response to CPI's tactic to understand how to alert the IRS.  As described above, although the IRS has agreed to forbear on Nader's tax liability for now, Nader is still subject to potential liability for the full amount of the tax liability CPI has pushed onto him, and/or subsequent and costly IRS examinations to understand how this tax debacle came to be.

121.   Nader has no fair recourse to the scheme being perpetrated by the Defendants. Nader cannot sell his CPI shares on the open market, as a de facto

**COMPLAINT**

1  minority shareholder he has no agency to influence corporate decisions, and the
2  majority bloc has made it clear that it will not buy out his shares at a fair price.

3  122. In the meantime, Terasa, Joshua and Rachel have lived what can only
4  be described as a lavish lifestyle since Fred passed. While Fred was alive, he always
5  lived frugally, and would not purchase expensive cars, clothes, watches, or other
6  personal property for himself or his family members. However, since Fred passed,
7  Terasa, Joshua and Rachel have used the money that Fred made to fund their lavish
8  lifestyle. They used the funds they obtained as a result of cutting Nader and David
9  out of Fred's will and the Filsoof Family Trust, and as a result of looting the assets
10 of CPI for their own personal use, in order to purchase numerous high-end cars,
11 designer clothes, plastic surgery, and regularly take expensive vacations in Los
12 Angeles, New York, London, Paris, Aruba, Antarctica, and many other locations.
13 By way of example only, Terasa purchased a new Bentley on or around June 10,
14 2023 (MSRP in the range of $200,000 - $300,000), a new Porsche Panamera on or
15 around June 27, 2020 (MSRP starts at $110,000), and a new Corvette on or around
16 December 4, 2024 (MSRP around $100,000) using such misappropriated funds.
17 Rachel purchased a new Corvette on or around May 14, 2024 (MSRP around
18 $100,000) using such misappropriated funds. Joshua purchased a Corvette in or
19 around November 12, 2020 (MSRP around $100,000) and an Audi R8 sports car
20 (MSRP around $200,000) on or before May 1, 2025 using such misappropriated
21 funds. Meanwhile, Terasa, Joshua and Rachel are forcing Nader into debt with the
22 IRS, have robbed him of his rightful inheritance, have converted his assets from the
23 Nader Trusts, and have refused to pay Nader his rightful distributions, income and
24 dividends owed to him as a 25% shareholder of CPI. This was all done for the
25 purpose of intentionally harming Nader, and attempting to financially destroy him,
26 while keeping all of Fred's money for themselves that they obtained through fraud.

27  ***Nader Yet Again Requests to Inspect CPI's Books and Records***

_____
**COMPLAINT**

123.   Via an April 23, 2024 letter, counsel for Nader gave CPI written notice of its request to inspect CPI's books and records pursuant to Georgia law, which letter complied with all requirements of O.C.G.A. § 14-2-1602(b) and (d).

124.   On May 7, 2024, CPI responded through counsel, rebuffing that request and once again refusing to let Nader inspect CPI's books and records, as is his right.

125.   CPI did attach copies of its 2022 balance sheet and 2022 profit and loss statement to its May 7, 2024 correspondence, but they were not accompanied by the required report from a public accountant who prepared them or a statement from CPI's president or other responsible person that the statements were or were not prepared on the basis of generally accepted accounting principles. See O.C.G.A. § 14-2-1620(b). CPI's document production was thus grossly insufficient under Georgia law and left Nader with no way to verify the accuracy of CPI's financial statements.

126.   Upon information and belief, CPI's 2022 balance sheet and 2022 profit and loss statement are false, misleading, incomplete, and/or inaccurate, and were sent as part of the majority bloc's ongoing scheme to defraud Nader and force him out of the company.

127.   By way of example, the 2022 balance sheet listed CPI's total liabilities as exceeding its assets. But the 2021 balance sheet that was provided in the Bennett Thrasher Report showed CPI's assets growing year over year, with 2021 assets exceeding liabilities by millions of dollars. In other words, CPI was sufficiently liquid to be able to offer to buy David's and Nader's shares at the end of 2021 for millions of dollars, but after Nader declined this buyout offer, the financial statements for the very next year (2022) showed negative equity.

128.   Upon information and belief, Joshua, Terasa, and/or the Board intentionally falsified the 2022 financial records that they sent Nader as part of their scheme to force Nader to sell his shares at less than their fair market value.

129.   After Nader responded on June 21, 2024 reiterating his demand to inspect CPI's corporate records as allowed under Georgia law, he was stonewalled once again in a June 28, 2024 letter from CPI's counsel.

130.   To date, Nader has never been provided any corporate information from CPI beyond the 2022 balance sheet and 2022 profit and loss statement, which are unverified, incomplete, fraudulent, and not useful in determining the valuation of his shares.

131.   Despite being entitled to it as a CPI shareholder, the majority bloc, corporate officers, and Board have also refused to provide Nader with a copy of the pertinent Shareholder Agreement so that Nader may be apprised of his rights thereunder.

### Current CPI Ownership and Power Dynamic

132.   CPI currently has four equal shareholders: Nader Filsoof, Joshua Filsoof, Rachel Filsoof, and the Filsoof Family Trust, whose shares are controlled by Joshua Filsoof. Each shareholder nominally controls 25% of the company.

133.   Upon information and belief, Joshua effectively controls his sister Rachel's 25% stake in the company, in addition to the 50% stake he controls outright, making him the de facto 75% majority shareholder in CPI. Alternatively, Joshua and Rachel act in concert as a 75% majority bloc.

134.   Thus, Nader is a de facto sole minority shareholder, with a 25% interest in CPI.

135.   The majority bloc continues to single out Nader to receive $0 in corporate distributions and to deprive him of complete and accurate financial information as part of its continued bid to oppress him and squeeze him out of the

_____
**COMPLAINT**

company at an unfairly low price, while at the same time saddling Nader with millions of dollars in tax liability that he has no means of paying in order to bankrupt him and force him to accept the lowball offer for his shares in CPI out of desperation.

136.    Indeed, Defendants have even failed to include Plaintiff in any annual shareholder meetings since 2021. Despite the fact that CPI's bylaws, and Georgia law (O.C.G.A § 14-2-701), require an annual shareholder meeting, Plaintiff has not been invited to any annual or special shareholder meeting since April 5, 2021. This is in breach of CPI's bylaws and Georgia law, and is yet another way that Defendants have practically cut Plaintiff out of CPI despite the fact that he is still a 25% shareholder. Plaintiff is the only shareholder who has been denied the ability to attend the annual (or any other) shareholder meetings. Plaintiff is also the only shareholder who has been denied the financial statements of CPI required to be provided to all shareholders, without any demand for such records, pursuant to paragraph 8.4 of the bylaws. A true and accurate copy of CPI's bylaws are attached hereto as **Exhibit 1** and incorporated by reference.

137.    Due to the aforementioned actions by Joshua, (and with the Board's, Terasa's, and Rachel's knowledge, consent, aid, and encouragement), Nader has been targeted as the de facto sole minority shareholder and injured in a way that is unique to him.

138.    The Defendants have worked in concert to oppress Nader and squeeze him out of the company, in ways that are independent of any harm to the corporation or to any of the other shareholders.

### Derivative Allegations

139.    Plaintiff brings this action in his individual capacity as a direct action rather than derivatively.

_____
**COMPLAINT**

140.   All of Plaintiff's claims are properly asserted as direct actions rather than derivative actions because Plaintiff has alleged a special injury separate and distinct from that suffered by CPI or the other shareholders such that he has standing to bring his claims in a direct action.

141.   However, even if this Court were to determine that any of Plaintiff's claims are derivative in nature, rather than direct, Plaintiff can establish that he was not required to make any pre-filing demand on CPI's Board to bring suit asserting any derivative claims set forth herein because pre-suit demand is excused as a matter of law.

142.   As of the filing of this Complaint, on information and belief, the Board of CPI is controlled by Joshua Filsoof and Terasa Filsoof. Joshua Filsoof and Terasa Filsoof are incapable of considering a demand to commence and prosecute this action because they face substantial personal liability for the actions complained of herein, including but not limited to self-dealing, as well as violations of law that specifically target and single out Plaintiff for the express purpose of causing him harm.   Joshua Filsoof, Terasa Filsoof, and any other directors controlled by them, are therefore incapable of objectively considering a pre-suit demand to bring these claims. Thus, demand is futile.

143.   Plaintiff has attempted to address his injuries alleged herein with CPI and the Board before filing suit. As set forth above, Plaintiff has served three inspection demands upon CPI, all of which have been rebuffed by CPI for no legally valid reason. Indeed, CPI has even refused to provide Plaintiff with those records which do not require any good faith purpose under Georgia law, as well as records and information to which he is entitled under CPI's bylaws without making any request.

144.   Not only that, Plaintiff has been excluded from all shareholder meetings and communications of any nature since 2021. CPI's directors have made it clear to

_____
**COMPLAINT**

Plaintiff that they will continue to refuse to treat him as a valid shareholder of CPI by refusing to comply with any demands made by Plaintiff, and by cutting him off from any information or meetings concerning CPI, even though the law and CPI's bylaws require that Plaintiff be able to attend such meetings and receive such information.

145.    Just as CPI—acting under the control of Defendants—has refused to comply with Plaintiff's valid inspection demands, and has completely shut him out of the company, it is readily apparent that any pre-suit demand, asking Defendants to essentially sue themselves, would be futile. Thus, no such demand was required in respect of any of Plaintiff's claims, even if any such claims are treated as derivative rather than direct.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

146.    At all relevant times, Plaintiff is and was a "person" within the meaning of 18 U.S.C. § 1961(3).

147.    At all relevant times, Plaintiff is a "person" who has sustained injury to his business or property by reason of Defendants' conduct, within the meaning of 18 U.S.C. § 1964(c).

148.    At all relevant times, Defendants Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and Does 1 - 20 are and were "persons" within the meaning of 18 U.S.C. §§ 1961(3), 1962(a) – (c), 1962(d), and 1964(a), because they are capable of holding and do hold "a legal or beneficial interest in property."

149.    Defendants Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and the Board (consisting of Does 1 - 20) operated CPI as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "CPI Enterprise"). CPI is a corporation and meets the definition of an "enterprise" under 18 U.S.C. § 1961(4).

_____
**COMPLAINT**

150.    Additionally, Defendants Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, CPI, the Board (consisting of Does 1 - 4), the Estate of Fred Filsoof, the trustee(s) of the Nader Trusts, Laurelbrook, Coordinated Capital, Sherkat Nafis, and other individuals and entities whose identities are presently unknown to Plaintiff (Does 5-20) associated-in-fact together for the purpose of carrying out an ongoing criminal enterprise, and acted as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Filsoof Enterprise," and together with the CPI Enterprise, the "Enterprises").

151.    The conduct of the Enterprises was ongoing in nature, over a period of years, including but not limited to 2019 to present.

152.    At all relevant times, the Enterprises were engaged in, and their activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c). CPI is an enterprise that is engaged in and affects interstate commerce because the company owns, operates, buys and sells real estate in multiple states across the United States, and Defendants transferred money, documents and property to and from different states using the mail and wires of the United States, as described herein.

153.    The Filsoof Enterprise also affected and operated in interstate commerce, as it included the transfer of assets, real estate, and monetary transactions in interstate commerce as described herein.

154.    Defendants created and operated the Enterprises and used them to devised a scheme to oppress, defraud, and extort Nader (the "Scheme") by misrepresenting the true value of Nader's shares in CPI, singling him out for discontinued corporate distributions to cover his pass-through tax liability, failing to account for the corporate income of CPI attributed to Nader in corporate tax filings or paying the income over to him, orchestrating the payment of distributions, dividends, salaries, or other monies to the majority shareholder bloc so they would

_____
**COMPLAINT**

not be burdened by pass-through tax liabilities, refusing to provide Nader with sufficient information and documentation to value his shares, providing Nader with fraudulent documentation and information relating to the value of his shares in CPI, attempting to force Nader to sell his shares in CPI at a distressed, fire-sale price in order to satisfy his ever-growing tax liability imposed upon him by Defendants, fraudulently disinheriting Nader from Fred's estate and the Filsoof Family Trust, converting assets belonging to the Nader Trusts, and diverting income and assets belonging to CPI to their own personal use. This Scheme was directed solely at Nader and the resulting harm was suffered only by Nader, not CPI or any of the other shareholders of CPI. Indeed, Defendants intended to financially crush Nader and leave him without any ability to challenge their actions. Defendants used the funds that they wrongfully acquired through fraud to purchase luxury cars, trips, clothes, plastic surgery and other personal expenses for themselves, thereby personally enriching themselves at Nader's expense.

155.   For purposes of their Scheme, Defendants operated the CPI Enterprise as a primary and overarching enterprise, and in connection with a pattern of racketeering activity designed to squeeze out and financially destroy Plaintiff and enrich themselves. Defendants continue to organize themselves together, both formally through CPI and other entities and informally as family, and have also operated the Filsoof Enterprise in order to further accomplish their Scheme. Defendants continue to function together as a continuing unit, in that they continue to impose tax liability upon Nader, year after year, without any provision of distributions, dividends, or income associated therewith, in order to further cause Nader financial harm, thereby increasing the pressure upon him to accept a lowball offer for his shares in CPI and unfairly squeeze him out. Further, with each passing day, Defendants continue to spend money and assets wrongfully diverted from Nader on their luxury cars, clothes, and lifestyle, while keeping Nader in debt with

**COMPLAINT**

the tax authorities and denying him his rightful share of dividends, income, and distributions owed to him by CPI, as well as the millions he is owed under his rightful inheritance from Fred Filsoof.

156.    While Joshua Filsoof operated and managed the Enterprises, the Enterprises functioned as a continuing unit with a common purpose of executing the Scheme against Nader and thereby enriching themselves at Nader's expense through a course of criminal conduct.

157.    The de facto majority bloc of CPI (Joshua, Rachel, and the Filsoof Family Trust) entered into the Scheme for the common purpose of gaining control of CPI and enriching themselves at Nader's expense.

158.    While not a CPI shareholder, Terasa is a beneficiary of shareholder Filsoof Family Trust, thereby having a direct financial interest in the Scheme, and also has an interest in supporting the interests of her natural children, Joshua and Rachel, at the expense of her stepson, Nader. Terasa also serves as an officer of CPI. Furthermore, as the matriarch of the family, Terasa has been the ringleader of Joshua and Rachel's actions when it comes to her life's work of cutting off Nader and David from their father, both during his life and after his passing. Terasa consistently antagonized Fred Filsoof and attempted to turn him against Nader and David in order to favor her children, Joshua and Rachel, and has poisoned Joshua and Rachel against Nader and David since birth. Joshua and Rachel have acted at Terasa's direction in accomplishing the Scheme.

159.    The Board is controlled and/or directed by Joshua, and, upon information and belief, Joshua has induced the other members of the Board to support his Scheme against Nader for their own financial gain.

160.    Joshua's communications with Nader were made with Rachel Filsoof's, Terasa Filsoof's, the Filsoof Family Trust's, and the Board's willful

**COMPLAINT**

participation, consent, aid, and knowledge that the actions described below were misleading, untrue, fraudulent, and done with the intent to further the Scheme.

161.   By engaging in this course of conduct targeting Nader, the Defendants all operated outside of their official capacities as officers, directors, and/or shareholders of CPI, acting instead to personally enrich themselves by ensuring they kept a greater piece of CPI's profits, ownership and/or value for themselves, thereby profiting from their fraud. As set forth above, Defendants have done so in order to fund their luxurious lifestyle at Nader's expense, regularly purchasing cars costing several hundreds of thousands of dollars, going on luxurious trips, purchasing designer clothes, and undergoing expensive cosmetic procedures. Defendants have funded their lifestyle by wrongfully obtaining millions of dollars from the estate of Fred Filsoof and Filsoof Family Trust that rightfully belong to Nader and David, converting assets from the Nader Trusts, and wrongfully diverting funds out of CPI to directly their personal accounts or through intermediary entities, including but not limited to Laurelbrook, Coordinated Capital and Sherkat Nafis. Defendants have transferred funds to such entities and then routed such funds directly to themselves for personal use. This includes but is not limited to a transfer made from Sherkat Nafis to Joshua and Terasa on or about August 9, 2023. Such transfers have no legitimate business purpose and constitute embezzlement of corporate funds. Of course, Nader is the only shareholder of CPI that is not receiving such funds or profiting from Defendants' fraud, and therefore has suffered a distinct injury from the other shareholders, each of which have directly enriched themselves as a result of their fraudulent acts, to Nader's detriment.

## FIRST CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL RICO STATUTE, 18 U.S.C. §§ 1962(c),  1964(c)

**(Against Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and Does 1-20)**

_____
**COMPLAINT**

162.   Plaintiff realleges and incorporates all of the above paragraphs as fully set forth herein.

163.   Joshua Filsoof operated or managed the RICO Enterprises through a pattern of racketeering activity, for the unlawful purpose of intentionally defrauding and oppressing Plaintiff, and Plaintiff was harmed in his business or property by reason of those RICO violations. Joshua Filsoof took these actions under the direction of Terasa Filsoof, and Rachel Filsoof consented to, aided, abetted, and encouraged the actions of Joshua and Terasa by acting in concert with them in carrying out the Scheme.

164.   At all relevant times, Joshua Filsoof was the CEO and CFO of CPI.

165.   At all relevant times, Terasa Filsoof was an officer of CPI.

166.   At all relevant times, the Board (Does 1-4) were the directors of CPI.

167.   As a result, Joshua Filsoof, Terasa Filsoof, and the Board conducted or participated in the conduct of the affairs of the CPI Enterprise by their operation and/or management of CPI, that is, they used CPI as the vehicle through which an unlawful pattern of racketeering activity was committed—through their roles as officers and directors of CPI. As set forth below, their roles allowed them to control the resources and instrumentalities of CPI and use that control to perpetrate the Scheme through predicate acts of racketeering that were designed to punish and financially harm Nader while fraudulently increasing their own wealth at his expense.

168.   Additionally, Defendants Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, and the Board associated in fact with the Filsoof Family Trust, the estate of Fred Filsoof, the trustee(s) of the Nader Trusts, CPI, Laurelbrook, Coordinated Capital, Sherkat Nafis, and other individuals and entities whose identities are presently unknown to Plaintiff (Does 5-20) to devise and carry out the Scheme against Nader through the Filsoof Enterprise, in connection with a pattern of

**COMPLAINT**

1   racketeering activity and through predicate acts of racketeering, as needed in order
2   to carry out their specific multiple patterns of racketeering activity described herein.

3   169.   Pursuant to and in furtherance of the Scheme described above, Joshua
4   Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, the Board, and
5   Does 5-20 committed, caused and/or directed multiple related acts of mail fraud (18
6   U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), attempted Hobbs Act extortion (18
7   U.S.C. § 1951), the transfer or receipt of converted or fraudulent proceeds (18
8   U.S.C. §§ 2314 – 2315), unlawful monetary transactions (18 U.S.C. §1957), money
9   laundering (18 U.S.C. §1956), and interstate racketeering (18 U.S.C. §1952), which
10  are predicate acts pursuant to 18 U.S.C. § 1961(1).

11  **Mail Fraud Predicate Acts**

12  170.   On or about September 18, 2022, CPI, at the direction of and with the
13  approval of Joshua, Terasa and the Board, mailed Nader's 2021 K-1 tax form to the
14  IRS. On or about October 14, 2022, CPI, at the direction of and with the approval
15  of Joshua, Terasa and the Board, mailed Nader's 2021 K-1 tax form to him.

16  171.   On or about September 15, 2023, CPI, at the direction of and with the
17  approval of Joshua, Terasa and the Board, mailed Nader's 2022 K-1 tax form to
18  him, and separately, to the IRS.

19  172.   On or about September 16, 2024, CPI, at the direction of and with the
20  approval of Joshua, Terasa and the Board, mailed Nader's 2023 K-1 tax form to
21  him, and separately, to the IRS.

22  173.   On or about September 12, 2025, CPI, at the direction of and with the
23  approval of Joshua, Terasa and the Board, mailed Nader's 2024 K-1 tax form to
24  him, and separately, to the IRS.

25  174.   By sending the 2021, 2022, 2023, and 2024 K-1 forms to Nader and
26  the IRS in the mail, Joshua, Terasa and the Board violated 18 U.S.C. § 1341 by

27

_____
**COMPLAINT**

using the mails for the purpose of executing, or attempting to execute, the Scheme to defraud, oppress, and squeeze out Nader.

175.   The mailing of each of these K-1 tax forms was a predicate act of mail fraud under RICO because, upon information and belief, they contain false information or, even if the information is accurate, they were sent, and the tax burdens increased upon Nader, in furtherance of the Scheme to oppress and squeeze out Nader.

176.   Joshua, Terasa, Rachel, and the Board knew that the 2021, 2022, 2023, and 2024 K-1 forms were false or misleading and were sent to Nader and the IRS in furtherance of the Scheme.

177.   On May 7, 2024, Joshua, Terasa and the Board, through CPI's attorneys, used the mails to falsely claim that Nader was not entitled to inspect the corporate books and records, despite his entitlement to do so under Georgia law.

178.   On May 7, 2024, Joshua, Terasa and the Board, through CPI's attorneys, also used the mails to transmit false and fraudulent financial statements to Nader.

179.   Joshua, Terasa and the Board, via CPI's attorneys, made these false and misleading statements with full knowledge of their false nature and with an intent to defraud and mislead Nader.

180.   Joshua, Terasa, Rachel, and the Board knew that the May 7, 2024, letter and accompanying financial statements were false or misleading and were sent to Nader in furtherance of the Scheme to force Nader out of the company at an unfairly devalued price.

181.   By sending the May 7, 2024, letter and accompanying financial statements, Joshua, Terasa and the Board violated 18 U.S.C. § 1341 by using the mails for the purpose of executing, or attempting to execute, the Scheme to defraud, oppress, and squeeze out Nader.

_____
**COMPLAINT**

**Wire Fraud Predicate Acts**

182.   On information and belief, Defendants also transmitted and/or caused CPI to transmit to the IRS through electronic means the 2021, 2022, 2023, and 2024 K-1 forms related to Nader described above, and committed wire fraud in doing so, as such forms were sent to the IRS for the purpose of executing, or attempting to execute, the Scheme to defraud, oppress, and squeeze out Nader.

183.   The December 2, 2021, email described above was a predicate act as an act of wire fraud.

184.   By sending the December 2, 2021, email, Joshua Filsoof violated 18 U.S.C. § 1343 by using wire communications to intentionally participate in a scheme to defraud Nader of money and property rightfully belonging to him. The December 2, 2021, email contained multiple material misrepresentations which were calculated to deceive Nader into accepting a lowball buyout offer at substantially less than fair market value.

185.   In addition, by sending Nader the Bennett Thrasher Report via email, which Report he knew to be riddled with errors, inconsistencies, and undervalued property evaluations, Joshua Filsoof violated 18 U.S.C. § 1343 by using wire communications to intentionally participate in the Scheme to defraud Nader of money and property rightfully belonging to him.

186.   The purpose of Joshua's December 2 email communication was to, in furtherance of the Scheme, induce Nader to accept an unfairly reduced price for his share of CPI.

187.   Joshua's December 3, 2021, email to Nader in which he refused to provide Nader with any additional information was a predicate act as an act of wire fraud.

188.   Joshua sent the December 3 email with full knowledge that Nader was entitled to inspect the corporate books and records under Georgia law and that a

_____
**COMPLAINT**

review of such books and records would reveal the severe undervaluation in the Bennett Thrasher Report.

189.   By sending the December 3, 2021, email, Joshua Filsoof violated 18 U.S.C. § 1343 by using wire communications to intentionally participate in a scheme to defraud Nader of money and property rightfully belonging to him. The December 3, 2021, email contained multiple material misrepresentations which were calculated to deceive Nader into accepting a lowball buyout offer at substantially less than fair market value.

190.   The October 17, 2022, email in which Joshua represented to Nader that—for the first time—he would not be receiving any corporate distributions from CPI to cover a massive tax liability also contained the false statement that the company would not be making distributions to any shareholder for that year.

191.   Joshua made this statement knowing that CPI would indeed make distributions to himself, Rachel, and the Filsoof Family Trust. Alternatively, Joshua made this statement knowing that the pass-through tax liability accrued by himself, Rachel, and the Filsoof Family Trust would be covered in other ways, such as through increased salaries or other consideration such as cash payments or no consideration asset transfers, that were not made available to Nader.

192.   By sending the October 17, 2022, email, Joshua Filsoof violated 18 U.S.C. § 1343 by using wire communications to intentionally participate in a scheme to defraud Nader of money and property rightfully belonging to him, to oppress him, and to extort him to accept a below-market buyout for his shares.

193.   Joshua, Terasa, Rachel, and the Board knew that the December 2, 2021, email and accompanying Bennett Thrasher Report, the December 3, 2021 email, and the October 17, 2022 email were false or misleading and were sent to Nader in furtherance of the Scheme.

**COMPLAINT**

194.   In addition, Defendants made monetary wire transfers on a regular basis to their personal accounts which included funds that were derived from income generated by CPI and wrongfully diverted to intermediate entities controlled by Defendants and/or to their personal accounts. This includes, by way of example only, the August 9, 2023 wire transfer made by Defendants Terasa, Joshua and Rachel of $1 million from Sherkat Nafis to their personal accounts.

195.   Defendants also participated in a scheme or artifice to defraud or attempt to defraud Nader by destroying the 2019 amendments to Fred Filsoof's will and the Filsoof Family Trust, which included Nader and David, and in procuring the 2017 will and amendment by fraud and undue influence, and presenting them as valid in probate, knowing that they destroyed the 2019 documents. Defendants engaged in this conduct in order to enrich themselves by tens of millions of dollars, and to deny Nader his rightful inheritance.

196.   Defendants, or someone associated with the scheme or artifice, transmitted communications by means of a telephone, computer or fax machine connected to interstate wires for the purpose of executing such scheme or artifice; and

197.   Defendants, or someone associated with the scheme or artifice, used a telephone, computer or fax machine connected to interstate wires willfully and with the specific intent to carry out some essential step in attempting to carry out the scheme or artifice to defraud or attempt to defraud Plaintiffs.

198.   In that regard, the interstate telephone wires were used on a regular, continuous and systematic basis in connection with the implementation and execution of the various schemes set forth above.

199.   By way of example only, Defendants filed, or caused to be filed, using a telephone, computer or fax machine connected to interstate wires, the 2017 will and 2017 amendments to the Filsoof Family Trust in probate court in Georgia in or

**COMPLAINT**

around 2020, when such filings were made, knowing the same to be false and superseded by the 2019 will and amendment, in order to exclude Nader from his rightful inheritance as promised by Fred Filsoof, thereby committing a fraud against Nader and the probate court.

200.    Defendants also used telephone communications to accomplish this scheme, by intercepting and/or interfering with communications between Nader and Fred Filsoof's phone and/or email, and by sending email and/or text messages to Nader from Fred Filsoof's cell phone and/or email that were designed to alienate Nader and David from Fred in order to exert undue influence and fraudulently induce Fred into amending his will and the Filsoof Family trust in 2017 to cut out Nader and David from their inheritance. These acts primarily occurred in or around 2017 when Fred was undergoing multiple surgeries. Terasa herself intercepted and sent such communications, and directed Joshua and Rachel to do the same (which they did), in order to perpetrate this fraud.

**Attempted Hobbs Act Extortion Predicate Acts**

201.    The October 17, 2022 email described above was a predicate act as an act of attempted extortion under the Hobbs Act.

202.    By preparing, agreeing to send, and sending the October 17, 2022, email, Joshua Filsoof, Terasa Filsoof, and the Board violated 18 U.S.C. § 1951 by attempting to obtain money properly owed to Nader by the wrongful use of fear of economic loss, and thereby attempted to interfere with interstate commerce. Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, and the Board sought to place Nader in a financial bind by making him solely responsible for a $700,000 tax liability, placing him in a position where he could be manipulated into accepting an even lower buyout price for his share of CPI.

_____
**COMPLAINT**

203.   Joshua Filsoof, Terasa Filsoof, and the Board all agreed on the contents of the October 17, 2022 and the strategy and plan to impose unfair tax liability on Nader while withholding the income and distributions associated therewith.

204.   The act of withholding CPI corporate distributions from Nader was a predicate act as an act of attempted extortion under the Hobbs Act, 18 U.S.C. § 1951.

205.   By withholding CPI corporate distributions, Joshua Filsoof, Terasa Filsoof, and the Board violated 18 U.S.C. § 1951 by retaining for themselves, money properly owed to Nader by the wrongful use of fear of economic loss, and thereby attempted to interfere with interstate commerce.

## Interstate Transfer and Receipt of Money Obtained Through Fraud Predicate Acts

206.   As described herein, Defendants violated 18 U.S.C. §§ 2314 – 2315, when they transported, transmitted, transferred, received, possessed, concealed, stored, bartered, sold, and/or disposed in interstate or foreign commerce any securities and/or money, of the value of $5,000 or more, knowing the same to have been converted or taken by fraud, and when they transported money or property in interstate commerce having a value of $5,000 or more as a result of their scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

207.   As set forth above, Joshua Filsoof, Terasa Filsoof and the Board provided false information for inclusion in the Bennett Thrasher report that purportedly valued Nader's and David's shares in CPI. In reliance on the false information contained in the Bennett Thrasher report, David in fact sold his shares in CPI back to the corporation on or around December 2021 – January 2022. Defendants thereafter received David's shares in CPI in interstate commerce, which are securities valued more than $5,000, as David was paid several million dollars

44

for such securities. David, a resident of California, transferred the shares to CPI, a Georgia corporation, in interstate commerce. Since the transaction was the result of fraud, namely Defendants' provision of false, fraudulent and materially misleading financial statements of CPI and valuation of David's shares pursuant to the Bennett Thrasher report, such securities were transferred as a result of Defendants' fraud, fraudulent inducement, concealment, misrepresentations, and scheme or artifice to defraud. Further, Defendants thereafter wrongfully diverted all of the taxes on the transaction to David, which was not agreed upon by the parties in advance, in order to further reduce the amount paid to David.

208.   In or around December 2019, shortly after the death of Fred Filsoof, Joshua Filsoof, at the direction and with the approval of Terasa Filsoof, wrongfully took all documents related to the Nader Trusts from Fred Filsoof's personal effects, and refused to turn them over to Plaintiff, despite repeated requests for the same, and thereafter wrongfully interfered with the possession of the assets of the Nader Trusts by Plaintiff. Thus, Joshua and Terasa Filsoof converted the assets and ownership of the Nader Trusts, as alleged herein, and thereafter transferred and received money and/or property belonging to the Nader Trusts in interstate commerce, including but not limited to rental income from the NY Condo. The rental income of the NY Condo was approximately $6,500 per month. Such income was then transferred to Joshua, Terasa, and Rachel Filsoof. Each time that Joshua, Rachel, and/or Terasa received or transferred such funds, which is assumed to be approximately every month since approximately December 2019, they again committed a violation of 18 U.S.C. §§ 2314 – 2315.

209.   Beginning shortly after the death of Fred Filsoof in November 2019, and thereafter, Joshua, Terasa and Rachel Filsoof wrongfully acquired money, property, and securities rightfully belonging to Nader and his brother David. As set forth herein, Joshua, Terasa and Rachel Filsoof destroyed and/or concealed the 2019

_____
**COMPLAINT**

will and testament of Fred Filsoof and 2019 amendment to the Filsoof Family Trust which provided that Nader and David, as well as Terasa, Rachel and Joshua, were all treated equally upon Fred's death and were to receive 20% of his estate, as well as equal treatment as beneficiaries under the Filsoof Family Trust. By destroying and/or concealing such documents, and presenting the 2017 will and trust amendments to the probate court as valid and binding, when Defendants knew they were not, Joshua, Terasa and Rachel Filsoof converted and/or obtained by fraud property, securities, and cash that were the rightful property of Nader and/or David Filsoof. Joshua, Terasa and Rachel Filsoof thereafter transferred and/or received in interstate commerce such property, assets, securities, and cash, which exceeded several millions of dollars. By way of example only, this includes a number of luxury vehicles costing hundreds of thousands of dollars each, luxury designer clothes, and funding their lifestyle of taking expensive trips and paying for cosmetic surgery, all of which has been purchased after Fred's death in 2019.

210.    As alleged herein, after gaining control of CPI after the death of Fred Filsoof in November 2019 and continuing to the present, Joshua, Terasa and Rachel Filsoof wrongfully converted cash and assets of CPI to their own personal use, including but not limited to paying themselves excessive cash payments, engaging in zero consideration asset transfers, and giving themselves interest-free, non-recourse loans.    Thus, Joshua, Terasa and Rachel Filsoof converted cash and/or securities in excess of $5,000 which rightfully belonged to CPI, and transferred and received such cash and/or securities, in interstate commerce.

211.    On information and belief, the Board approved the foregoing actions.

212.    Defendants have also taken control of other entities, including but not limited to Coordinated Capital, Laurelbrook, and Sherkat Nafis, to act as further intermediaries for transferring their fraudulent proceeds in interstate commerce. None of those entities generate any income. CPI is the only income-generating

**COMPLAINT**

corporation. Defendants have nevertheless diverted millions of dollars in income and assets from CPI to these entities since Fred's death in 2019, and then have transferred funds from those intermediate entities to themselves in order to attempt to conceal their fraud. By way of example only, on or around August 9, 2023, Defendants transferred $1 million from Sherkat Nafis to the personal accounts of Terasa, Joshua, and Rachel which was funded by income wrongfully diverted to that entity from CPI.

213.    Each violation of 18 U.S.C. §§ 2314 – 2315 by each Defendant constituted a predicate act.

## Monetary Transactions with Unlawful Proceeds in violation of
## 18 U.S.C. §1957

214.    The course of conduct set forth above constitutes violations by Joshua Filsoof, Terasa Filsoof and Rachel Filsoof of 18 U.S.C. §1957 in that they each: (a) unlawfully obtained proceeds from, or that rightfully belonged to, Nader as a result of their fraudulent conversion of assets from the Nader Trusts and the Estate of Fred Filsoof due to their destruction of the 2019 will and amendment to the Filsoof Family Trust that wrongfully denied Nader his inheritance, and converted assets of CPI for their own benefit, including money and property transferred to themselves or intermediate entities controlled by them for little or no consideration and interest-free non-recourse loans (the "Funds"); (b) knowingly engaged in or attempted to engage in a monetary transaction (the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution which is engaged in, or the activities of which affect, interstate commerce in any way or degree) in connection with property of a value greater than $10,000; and (c) the Funds involved in the acquisition were proceeds of a violation of Specified Unlawful Activity (as defined under 18 U.S.C. §1956),

_____
**COMPLAINT**

1    including the proceeds of a violation of 18 U.S.C. §§1341, 1343, 1951, 1952, 1956,
2    2314 and/or 2315.

3         215.   Since Joshua Filsoof, Terasa Filsoof and Rachel Filsoof used proceeds
4    derived from a Specified Unlawful Activity to acquire David's 20% ownership
5    interest in CPI, as well as acquire numerous other assets, including real and personal
6    property described above such as luxury cars, designer clothes and cash, of a value
7    in excess of $10,000, and, in connection therewith, used a financial institution which
8    was engaged in, or the activities of which affect, interstate commerce, Joshua
9    Filsoof's, Terasa Filsoof's and Rachel Filsoof's conduct constitutes monetary
10   transactions with unlawful proceeds in violation of 18 U.S.C. §1957.

11   **<u>Money Laundering in Violation of 18 U.S.C. §1956</u>**

12        216.   As set forth above, Joshua Filsoof, Terasa Filsoof and Rachel Filsoof
13   unlawfully obtained proceeds from, or that rightfully belonged to, Nader as a result
14   of their fraudulent conversion of assets from the Nader Trusts and the Estate of Fred
15   Filsoof due to their destruction of the 2019 will and amendment to the Filsoof
16   Family Trust that wrongfully denied Nader his inheritance, and converted assets of
17   CPI for their own benefit, including money and property transferred to themselves
18   or intermediate entities controlled by them  for little or no consideration and interest-
19   free non-recourse loans (the "Funds").

20        217.   Joshua Filsoof, Terasa Filsoof and Rachel Filsoof were involved in one
21   or more transactions (i) which in any way or degree affected interstate commerce
22   (1) involving the movement of Funds by wire or other means, or (2) involving one
23   or more monetary instruments, or (3) involving the transfer of title to any real
24   property; or (ii) involving the use of a financial institution which is engaged in, or
25   the activities of which affect, interstate commerce in any way or degree (a
26   "Financial Transaction"). These Financial Transactions include, but were not
27   limited to, those described above involving the purchase of luxury cars, designer

_____
**COMPLAINT**

clothes, airfare, hotels, and other personal property using the Funds, in interstate commerce.

218.   Knowing that the Funds involved in a Financial Transaction represented the proceeds of some form of unlawful activity, Joshua Filsoof, Terasa Filsoof and Rachel Filsoof conducted or attempted to conduct a Financial Transaction which in fact involved the proceeds of a violation of 18 U.S.C. §§1341, 1343, 1951, 1952, 1957, 2314 and/or 2315 (the "Specified Unlawful Activity"), (i) with the intent to promote the carrying on of Specified Unlawful Activity; or (ii) knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Specified Unlawful Activity. Indeed, Joshua Filsoof, Terasa Filsoof and Rachel Filsoof regularly transferred funds out of CPI to intermediate entities controlled by them, including Laurelbrook, Coordinated Capital, and Sherkat Nafis, and such entities would then transfer funds to personal accounts of Joshua, Terasa and Rachel, in order to attempt to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Specified Unlawful Activity.

219.   Since Joshua Filsoof, Terasa Filsoof and Rachel Filsoof (1) conducted or attempted to conduct a Financial Transaction; (2) which they knew involved the proceeds of some form of unlawful activity; and (3) the unlawful activity in fact constituted a Specified Unlawful Activity, their conduct as set forth herein (including, without limitation, the predicate acts of mail fraud, wire fraud, transfer or receipt of converted or fraudulent property, attempted Hobbs Act extortion, interstate racketeering, and monetary transactions with unlawful proceeds), constitutes money laundering in violation of 18 U.S.C. §1956(a).

### Interstate Racketeering

220.   Joshua Filsoof, Terasa Filsoof and Rachel Filsoof engaged in unlawful activity under 18 U.S.C. §1952 because they engaged in (1) money laundering in

1   violation of 18 U.S.C. §1956; and (2) monetary transactions with unlawful proceeds

2   in violation of 18 U.S.C. §1957, as set forth above (the "Unlawful Activity").

3       221.   Joshua Filsoof, Terasa Filsoof and Rachel Filsoof used the United

4   States mail, wires, and other facilities of interstate commerce with intent to (1)

5   distribute the proceeds of any Unlawful Activity; or (2) otherwise promote, manage,

6   establish, carry on, or facilitate the promotion, management, establishment, or

7   carrying on, of any Unlawful Activity.

8       222.   The course of conduct of Joshua Filsoof, Terasa Filsoof and Rachel

9   Filsoof as set forth herein (including, without limitation, the predicate acts of mail

10  fraud, wire fraud, transfer or receipt of converted or fraudulent property, attempted

11  Hobbs Act extortion, monetary transactions with unlawful proceeds, money

12  laundering, and interstate racketeering described herein), constitutes interstate

13  racketeering in violation of 18 U.S.C. §1952.

14  **Pattern of Racketeering Activity**

15      223.   The predicate acts of mail fraud, wire fraud, transfer or receipt of

16  converted or fraudulent property, attempted Hobbs Act extortion, monetary

17  transactions with unlawful proceeds, money laundering, and interstate racketeering,

18  described above are related and form a pattern of racketeering activity, undertaken

19  with the common purpose of oppressing Nader and forcing him out of the company,

20  so that the remaining shareholders' own stake in the company may be improperly

21  increased, while Nader's personal finances are depleted as a result of the imposition

22  of unfair tax liability upon Nader without the benefit of distributions, payment of

23  income ascribed to Nader, dividends, or other benefits received by the other

24  shareholders (such as assets received for no consideration). Nader's assets were

25  further depleted, and the pressure on him to accept the low ball offer to sell his

26  shares in CPI, as a result of the fraudulent scheme perpetrated by Defendants to

27  deny Nader his rightful inheritance from Fred Filsoof and convert such property to

**COMPLAINT**

their own uses in order to personally enrich themselves, at Nader's expense. Nader is the only shareholder of CPI to be singled out in this manner, and to suffer this harm. This Scheme was also carried out in order to punish Nader after he provided testimony that did not support Rachel's case in the NY Lawsuit.

224.    Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and the Board have directly and indirectly conducted and participated in the conduct of the Enterprises' affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

225.    As a direct and proximate result of Joshua Filsoof's, Terasa Filsoof's, Rachel Filsoof, the Filsoof Family Trust's, and the Board's racketeering activities, Nader suffered pecuniary harm to his business or property. Specifically, he is in debt to the IRS for approximately $1 million in back federal and state taxes, fees, interest, and penalties that can be traced to pass-through tax liabilities from CPI. While Nader has received provisional relief from federal taxes due to retention of tax counsel, he still has outstanding state tax debt which compounds daily and has not been reversed, and the IRS has not released the tax liens (and thus could later choose to enforce them for the full amount). Further, if CPI wants to sabotage Nader's valuation or tax position further it can continue to misrepresent facts to the IRS and convince it that a reassessment of the reversed tax liability is necessary. Nader's state taxes still reflect CPI's erroneously filed Federal schedules and he continues to suffer as a result of state taxes which remain unadjusted notwithstanding the temporary relief that Nader has received from the IRS.

226.    Nader has also been damaged to the extent that he is owed unpaid dividends, distributions or other benefits which were provided to the other shareholders of CPI but withheld from Nader.

227.    Nader has also been damaged to the extent that he has been ascribed income of CPI for tax purposes, but has never been paid any such income.

_____
**COMPLAINT**

228.   Nader also stands to lose millions of dollars in value of his shares in CPI if here were forced to accept Joshua's undervalued buyout offer.

229.   Nader has also been damaged to the extent he has been forced to incur attorneys' fees and other professional fees related to seeking relief from Defendants' issuance and transmission of fraudulent and/or erroneous tax reports to the IRS.

230.   The predicate acts detailed herein led directly to, and were both the but-for and proximate cause of, Nader's injuries. Had the Enterprises never undertaken the Scheme to squeeze Nader out of CPI, he would not have accrued the millions in tax liabilities, would not have been denied millions of dollars in corporate distributions, income, dividends and other benefits paid to the other shareholders, and would have received a fair amount for his stake in the company three and a half years ago, which is a lost-opportunity cost.

231. Moreover, when David Filsoof relied upon these same misrepresentations to part with his share in the company, it placed Nader in the position of being the sole target of the Enterprises' Scheme and vitriol, and even further reduced his overall power within CPI because together with David, Nader formerly controlled 40% of the company, and now he controls just 25%.

232.   Because the pass-through tax liabilities continue to accrue year after year, and Nader has still not be paid the income assigned to him or any dividends, distributions or other benefits provided to the other shareholders, and the Enterprises continue to block Nader's access to corporate records, the Scheme is continuing and threatens to repeat into the future.

233.   Due to this violation of 18 U.S.C. § 1962(c), Nader seeks to recover threefold the damages he sustained therefrom and the costs of suit, including his reasonable attorneys' fees. 18 U.S.C. § 1964.

## <u>SECOND CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL RICO STATUTE, 18 U.S.C. §§ 1962(a),  1964(c)</u>

_____
**COMPLAINT**

**(Against Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, CPI, Does 1-20)**

234.   Plaintiff realleges and incorporates all of the above paragraphs as fully set forth herein.

235.   Defendants Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, CPI, and Does 1-20, each received substantial income derived, directly or indirectly, from a pattern of racketeering activity. As alleged above, these Defendants have each personally enriched themselves through the transfer and/or receipt of substantial amounts of money, property or securities that was converted or obtained by fraud in interstate commerce, and have derived further income as a result of their Scheme to financially destroy Plaintiff, squeeze him out from CPI, and deny him his rightful inheritance.

236.   Defendants Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, and the Filsoof Family Trust have each used or invested, directly or indirectly, such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, the Enterprises.

237.   More specifically, as set forth above, Defendants have used the income or the proceeds of such income obtained through their wrongful conversion of the assets of the Nader Trusts and the estate of Fred Filsoof which they transferred and/or received in violation of 18 U.S.C. §§ 2314 – 2315. Defendants used such income to purchase David Filsoof's shares in CPI for millions of dollars in or around December 2021 – January 2022, and thereby acquired an additional interest in CPI through racketeering activity, and have likewise used such income or proceeds to establish and operate the Enterprises by investing such funds into CPI and the Enterprises.

238.   CPI received benefits as a result of Defendants' racketeering activities and is therefore also liable under this section.

_____
**COMPLAINT**

239.   Indeed, the acquisition of assets from Fred Filsoof's estate, and the exclusion of Plaintiff from receiving millions of dollars in inheritance from Fred Filsoof, was used by Defendants to put pressure on Plaintiff to accept a lowball offer of his shares in CPI as a direct result of the financial strain placed upon Plaintiff by Defendants. Had Plaintiff obtained his rightful inheritance from Fred Filsoof, he would have had sufficient assets to challenge Defendants' claims on the estate of Fred Filsoof, and would have also had sufficient assets to make any lowball offer for Plaintiff's shares in CPI meaningless. However, because Defendants were able to exclude Plaintiff from his inheritance from Fred Filsoof, and thereafter converted not only Plaintiff's rightful inheritance but also significant assets and income from the Nader Trusts, and transferred and/or received such funds among themselves and between themselves and the Enterprises, in violation of 18 U.S.C. §§ 2314 – 2315, Plaintiff was placed right where Defendants wanted him—in a weak financial position that would (so they thought) force him to accept their offer to buy his shares in CPI for well below what they were worth. When that didn't work, Defendants continued to put pressure on Plaintiff by burying him in massive tax liabilities that further crushed his financial position in order to try to force him to sell his shares in CPI for a fire sale price and to punish Nader for his testimony in the NY Lawsuit, committing the predicate acts of mail fraud, wire fraud, attempted Hobbs Act extortion, interstate transfer or receipt of converted or fraudulent property, monetary transactions with unlawful proceeds, money laundering, and interstate racketeering. All the while, Defendants have been using the income derived from the estate of Fred Filsoof and CPI in order to fund the Scheme against Plaintiff and enrich themselves at Plaintiff's expense, and their use, transfer and/or receipt of such funds among themselves and between themselves and the Enterprises, in violation of 18 U.S.C. §§ 2314 – 2315, has caused Plaintiff harm.

240.   As a result, Defendants violated 18 U.S.C. § 1962(a).

**COMPLAINT**

241.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(a), Plaintiff has suffered substantial harm, including but not limited to the extent that he has lost the value of his inheritance as well as the true value of his shares in CPI. Plaintiff has also suffered harm to the extent that the mismanagement of CPI as an enterprise designed to financially crush Plaintiff, instead of as a company seeking to maximize profits, has reduced the value of Plaintiff's shares and any dividends he is entitled to, which is a harm unique to Plaintiff since the other shareholders have received consideration in the form of payments, dividends, and assets for no or low consideration that Plaintiff has not received. Additionally, Plaintiff has been harmed to the extent that Defendants misappropriated significant assets of CPI through self-dealing, including by paying themselves inflated salaries and other cash payments, transferring real property assets to themselves for no or below market consideration, and making loans to themselves without adequate consideration and/or on unreasonable terms, which they accomplished through direct transfers and/or through the use of transfers through intermediate entities including Laurelbrook, Coordinated Capital, and Sherkat Nafis, which entities then made substantial payments to the personal accounts of Defendants.

242.   Due to these violations of 18 U.S.C. § 1962(a), Nader seeks to recover threefold the damages he sustained therefrom and the costs of suit, including his reasonable attorneys' fees. 18 U.S.C. § 1964.

**THIRD CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL RICO STATUTE, 18 U.S.C. §§ 1962(b), 1964(c)**

**(Against Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, CPI, Does 1-20)**

243.   Plaintiff realleges and incorporates all of the above paragraphs as fully set forth herein.

_____
**COMPLAINT**

244.   Defendants Joshua Filsoof, Terasa Filsoof, Rachel Filsoof,  the Filsoof Family Trust and Does 1-20 each acquired or maintained, directly or indirectly, an interest in or control of the Enterprises through a pattern of racketeering activity.

245.   More specifically, as set forth above, Defendants wrongfully converted assets of the Nader Trusts, the Filsoof Family Trust, and the estate of Fred Filsoof, which income they transferred and/or received in violation of 18 U.S.C. §§ 2314 – 2315. By engaging in fraud to remove Nader and David as equal beneficiaries of the Filsoof Family Trust, Terasa, Joshua and Rachel became the sole beneficiaries of the Filsoof Family Trust, which owned 20% of CPI at the time. Had Nader and David each been treated as 20% beneficiaries under the Filsoof Family Trust under the 2019 amendment, they also would have been treated as owners of the 20% of CPI owned by the Filsoof Family Trust, and Defendants would not have had majority control over CPI. Instead, all members of the family would have essentially been treated equally – David and Nader each had 20%, while Rachel and Joshua each had 20%, and the remaining 20% would be owned by the Filsoof Family Trust that each family member was an equal beneficiary of. However, by fraudulently destroying the 2019 amendment to the Filsoof Family Trust, and therefore removing Nader and David as beneficiaries, Defendants were able to gain majority control over CPI by controlling the Filsoof Family Trust.

246.   The destruction of Fred Filsoof's 2019 will—which also made Nader and David equal beneficiaries and also designated David and Josh as co-presidents of CPI—further enabled Defendants to gain control over the Enterprises. After destroying the 2019 will, Joshua was able to claim that he, alone, should serve as the President of CPI, and Defendants' control of the majority of voting shares, obtained by fraud through cutting Nader and David out of the Filsoof Family Trust, meant that Nader and David were unable to prevent Joshua from naming himself as the sole President of CPI, or otherwise have any ability to elect officers or directors.

**COMPLAINT**

247.   Defendants then used the income they wrongfully converted or obtained by fraud from the Filsoof Family Trust, the Nader Trusts, and the Estate of Fred Filsoof to purchase David Filsoof's shares in CPI for millions of dollars in late 2021 or early 2022, and Defendants thereby acquired an additional interest in CPI through racketeering activity, i.e. using their ill-gotten gains to fund their acquisition of an additional interest in CPI that gave them full, super-majority control of the Enterprises.

248.   The acquisition of David's interest in CPI also allowed Defendants to continue to maintain their interest in the Enterprises, as it cemented their super-majority control of CPI. Whereas David and Nader controlled 40% of CPI before David sold his interest, after such sale, Nader's minority share was only 25%, while Defendants controlled 75%. Thus, Defendants now had super-majority control to effectively block Nader from having any legal control of the company and further diminishing his rights as a shareholder. Further, removing David also removed one more hurdle for Defendants to gain full ownership of CPI, leaving only Nader left to focus their efforts on.

249.   Defendants' maintenance of their interests in and control of the Enterprises was also accomplished through a pattern of racketeering activity beyond the acquisition of David's shares.

250.   Indeed, the acquisition of assets from Fred Filsoof's estate, and the exclusion of Plaintiff from receiving millions of dollars in inheritance from Fred Filsoof, which income they transferred and/or received in violation of 18 U.S.C. §§ 2314 – 2315, was also used by Defendants to seize control of the Enterprises immediately after the death of Fred Filsoof by fraudulently obtaining and converting all of Fred Filsoof's assets, to the exclusion of Nader and David, and using such assets to convince the Board and other members of the Enterprises to support their

_____
**COMPLAINT**

acquisition of control over the Enterprises through the payment and/or promise of financial remuneration.

251.   Defendants also used their control of the Enterprises to put pressure on Plaintiff to accept a lowball offer of his shares in CPI as a direct result of the financial strain placed upon Plaintiff by Defendants. Had Plaintiff obtained his rightful inheritance from Fred Filsoof, he would have had sufficient assets to challenge Defendants' claims on the estate of Fred Filsoof, and would have also had sufficient assets to make any lowball offer for Plaintiff's shares in CPI meaningless. However, because Defendants were able to exclude Plaintiff from his inheritance from Fred Filsoof, and thereafter converted not only Plaintiff's rightful inheritance but also significant assets and income from the Nader Trusts, and transferred and/or received such funds among themselves and between themselves and the Enterprises, in violation of 18 U.S.C. §§ 2314 – 2315, engaged in monetary transactions with unlawful proceeds, money laundering, and interstate racketeering. As a result, Plaintiff was placed right where Defendants wanted him—in a weak financial position that would (so they thought) force him to accept their offer to buy his shares in CPI for well below what they were worth. When that didn't work, Defendants continued to put pressure on Plaintiff by burying him in massive tax liabilities that further crushed his financial position in order to try to force him to sell his shares in CPI for a fire sale price and to punish Nader for his testimony in the NY Lawsuit, committing the predicate acts of mail fraud, wire fraud, attempted Hobbs Act extortion, the transfer or receipt of converted or fraudulent proceeds, unlawful monetary transactions, money laundering, and interstate racketeering. These predicate acts allowed Defendants to maintain their majority control of the Enterprises by further depleting Plaintiff's finances and therefore his ability to challenge their control of the Enterprises. By depriving Plaintiff of financial means, Defendants sought to deprive him of the ability to hire attorneys or other

professionals to challenge their unlawful conduct, which would allow them to continue to maintain control over the Enterprises.

252.   Defendants' pattern of racketeering activity therefore allowed them to maintain their interests in and control over the Enterprises by removing Plaintiff's ability to challenge their actions in any meaningful way, and allowing Defendants to continue to exclude Plaintiff from his rightful distributions, dividends and other monetary entitlements of CPI as well as his rightful inheritance from Fred Filsoof while facing massive tax liabilities wrongfully imposed upon Plaintiff in furtherance of the Scheme.

253.   CPI received benefits as a result of Defendants' racketeering activities and is therefore also liable under this section.

254.   As a result, Defendants violated 18 U.S.C. § 1962(b).

255.   Plaintiff was injured as a result of Defendants' acquisition and maintenance of control over the Enterprises.

256.   Had Plaintiff received his inheritance at the time of Fred Filsoof's death, as he should have, or had he received the substantial income, dividends or distributions he should have received from CPI or from other property such as the Nader Trusts, he would have been able to challenge Defendants' actions sooner. However, Plaintiff's financial condition, as a result of Defendants' pattern of racketeering activity, including the loss of his inheritance and the imposition of substantial tax liability, liens, and attorneys' fees expended seeking relief related to Plaintiff's tax liabilities have prevented Plaintiff from being in a financial position to take action sooner and more aggressively. Thus, Plaintiff has suffered distinct harm as a result of Defendants' acquisition or maintenance of interests in the Enterprises.

257.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(b), Plaintiff has suffered substantial harm, including but not limited to the

extent that he has incurred fees of attorneys and other professionals spent to challenge the fraudulent imposition of tax liability upon him by Defendants related to his ownership of shares in CPI, has been placed in a weaker position as a result of Defendants' acquisition of David's shares in CPI which was the result of fraud, has lost the ability to have any visibility into CPI's operations since approximately 2021, has been denied his rights as a minority shareholder of CPI, including but not limited to information rights, as well as financial rights to dividends, distributions and income, and has been harmed to the extent that Defendants have been unjustly enriched and have wrongfully converted Plaintiff's assets and property, including but not limited to his inheritance from Fred Filsoof, his beneficial interest in the Filsoof Family Trust, and the assets of the Nader Trusts.

258.   Nader has also suffered harm to the extent he has incurred attorneys' fees related to legal action he took prior to filing the instant lawsuit to attempt to challenge Defendants' wrongful conduct. Nader filed a complaint in Georgia state court on July 20, 2022, which the trial court erroneously dismissed with prejudice. Nader then incurred attorneys' fees filing an appeal related thereto, and the appellate court ultimately held that the trial court erroneously dismissed the suit with prejudice, when it should have done so without prejudice.   Nader incurred approximately $125,000 in relation to such litigation.

259.   All such injuries are unique to Nader and have not been suffered by any other shareholders of CPI, who have been compensated through payments, dividends, distributions and asset transfers not provided to Nader.

260.   Due to these violations of 18 U.S.C. § 1962(b), Nader seeks to recover threefold the damages he sustained therefrom and the costs of suit, including his reasonable attorneys' fees. 18 U.S.C. § 1964.

## FOURTH CAUSE OF ACTION FOR CONSPIRACY VIOLATION OF THE FEDERAL RICO STATUTE,

_____
**COMPLAINT**

## 18 U.S.C. §§ 1962(d),  1964(c)

**(Against Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and Does 1-20)**

261.   Plaintiff realleges and incorporates all of the above paragraphs as fully set forth herein.

262.   Defendants Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and the Board conspired and agreed together to commit the acts alleged above to make fraudulent misrepresentations to Nader, wrongly exclude him from corporate distributions, saddle him with unfair tax liability, deny him his rightful inheritance and other assets belonging to him in order to further crush him financially and remove his ability to challenge the Scheme, try to squeeze him out of the company at a fire-sale price and punish Nader for his testimony in the NY Lawsuit, in violation of the federal RICO statute, in violation of 18 U.S.C. § 1962(d).

263.   Joshua, Terasa, and Rachel are all family and have a vested, common interest in consolidating their power and control over CPI while excluding Nader.

264.   Thus, Joshua Filsoof conducted and managed the RICO scheme described above with the full knowledge and consent of Terasa, his mother and a co-officer of CPI, Rachel, his sister and part of the majority bloc, and the Filsoof Family Trust, of which he controls as the Trustee.

265.   The Board members are all controlled by Joshua and have been induced by Joshua, Rachel, and/or Terasa to participate in the Scheme for their own financial benefit.

266.   Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and the Board knew that the predicate acts described above were part of a pattern of racketeering activity and agreed to the commission of those acts to further

_____
**COMPLAINT**

the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

267.    Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and the Board knew that the funds used and/or derived from the predicate acts described above were used to harm Plaintiff and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), in violation of 18 U.S.C. § 1962(d).

268.    Joshua Filsoof, Terasa Filsoof, Rachel Filsoof, the Filsoof Family Trust, and the Board knew that they generated income from their fraudulent scheme, which led to their acquisition, maintenance, and control of the Enterprises, resulting in harm to Plaintiff, and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(b), in violation of 18 U.S.C. § 1962(d).

269.    As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property. Specifically, he faces tax liability to state and federal authorities of approximately $1 million in back that can be traced to pass-through tax liabilities from CPI. While Nader has received provisional relief from federal taxes due to retention of tax counsel, he still has outstanding state tax debt which compounds daily and has not been reversed, and the IRS has not released the tax liens (and thus could later choose to enforce them for the full amount).  Further, if CPI wants to sabotage Nader's valuation or tax position further it can continue to misrepresent facts to the IRS and convince it that a reassessment of the reversed tax liability is necessary.

270.    Nader has also been damaged to the extent that he is owed unpaid dividends, distributions or other benefits which were provided to the other shareholders of CPI but withheld from Nader.

_____
**COMPLAINT**

271.    Nader has also been damaged to the extent that he has been ascribed income of CPI for tax purposes, but has never been paid any such income.

272.    Nader also stands to lose millions of dollars he is entitled to if he were forced to agree to accept an undervalued buyout offer.

273.    Due to this violation of 18 U.S.C. § 1962(d), Nader seeks to recover threefold the damages he sustained therefrom and the costs of suit, including his reasonable attorneys' fees. 18 U.S.C. § 1964.

## FIFTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY TO MINORITY SHAREHOLDER / FREEZE OUT OF MINORITY SHAREHOLDER UNDER GEORGIA LAW
**(against Joshua Filsoof, individually, in his capacity as an officer of Coordinated Properties, Inc., and in his capacity as Trustee of the Filsoof Family Trust; Rachel Filsoof; Terasa Filsoof; Does 1-4)**

274.    Plaintiff realleges and incorporates all of the above paragraphs as though fully set forth herein.

275.    As a corporate officer and majority shareholder of CPI, Joshua Filsoof owes fiduciary duties to Nader.

276.    Rachel, acting in concert with her brother Joshua, acts as a 75% majority shareholder bloc in CPI.

277.    As a majority shareholder of CPI, Rachel Filsoof owes fiduciary duties to Nader.

278.    As an officer of CPI, Terasa Filsoof owes fiduciary duties to Nader.

279.    On information and belief, the Board consists of four directors (Does 1-4). As directors of the Board of CPI, the Doe Defendants owe fiduciary duties to Nader.

280.    Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, and the Board intentionally, maliciously, willfully, recklessly, or negligently breached his fiduciary duties to Nader by, among other things, improperly refusing to allow

**COMPLAINT**

Nader to review the corporate books and records, intentionally undervaluing Nader's share of the company, making him a "lowball" buyout offer with the aim of forcing him out of the company, singling him out for $0 in corporate distributions sufficient to cover Nader's pass-through tax liability, fraudulently misrepresenting CPI's finances and valuation of stock, providing Nader with false, fraudulent and/or misleading information about CPI and the valuation of Nader's stock, submitting property appraisals for use in the Bennett Thrasher Report that were undervalued by nearly $1 million, refusing to provide to Nader his tax returns or even Nader's own share certificates, transferring property, income and assets from CPI to intermediate entities also owned or controlled by members of the majority bloc for zero consideration in order to privately benefit Defendants (including Laurelbrook, Coordinated Capital and Sherkat Nafis), transferring funds (including but not limited to $1 million on or around August 9, 2023) from such intermediate entities to their personal accounts, making loans from CPI to Defendants or their trusts, with no supporting underlying loan documents on unfair and unreasonable terms, failing to account for the corporate income of CPI attributed to Nader in corporate tax filings or paying the income over to him, and by orchestrating the payment of distributions, dividends, salaries, or other monies to the majority shareholder bloc so they would not be burdened by pass-through tax liabilities. The Board took these actions directly or knowingly consented to and/or facilitated Joshua's actions.

281. Joshua Filsoof took these actions and exploited his position as a corporate officer and majority shareholder in an effort to oppress Nader as the minority shareholder and to squeeze him out of CPI, by forcing him to sell his ownership stake in the company for an artificially low amount.

282. Terasa Filsoof took these actions and exploited her position as a corporate officer and beneficiary of the Filsoof Family Trust, a shareholder in CPI, in an effort to oppress Nader as the minority shareholder and to squeeze him out of

**COMPLAINT**

CPI, by forcing him to sell his ownership stake in the company for an artificially low amount.

283.   Rachel Filsoof took these actions and exploited her majority shareholder position in an effort to oppress Nader as the minority shareholder and to squeeze him out of CPI, by forcing him to sell his ownership stake in the company for an artificially low amount.

284.   The Board took these actions and exploited their status as directors of CPI in an effort to oppress Nader as the minority shareholder and to squeeze him out of CPI.

285.   Upon information and belief, other than Nader, no other CPI shareholder has been refused sufficient corporate distributions to cover their pass-through tax liability, no other CPI shareholder has been refused access to the corporate books and records, no other CPI shareholder has been subject to a low-ball, squeeze-out offer, and no other CPI shareholder has been denied dividends.

286.   These breaches of Defendants' fiduciary duties caused a singular economic injury to Nader alone, in an amount to be proven at trial. Nader estimates that this amount is at least several millions of dollars.

287.   In addition, CPI is a closely held corporation, and none of the reasons underlying the general rule calling for corporate recovery pursuant to a derivative action exist in this case. Nader would not be adequately compensated by a corporate recovery, as any increase in the value of his shares would be irrelevant since there is no ready market for the shares of CPI. All of the shareholders of CPI are named in this lawsuit, so there is no risk of multiplicity of suits or prejudice to nonparties. Further, any corporate recovery would benefit the majority shareholder-wrongdoers (Defendants), giving Nader "an automatic right to maintain a direct action." *Thomas v. Dickson*, 250 Ga. 772, 774, 301 S.E.2d 49, 51 (1983). Thus, Nader has properly brought this claim directly, rather than derivatively.

_____
**COMPLAINT**

288.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Nader has sustained substantial damages.

289.   As alleged herein, Defendants were guilty of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, subjecting them to punitive and exemplary damages according to the reprehensibility of their conduct. Further, Defendants acted, or failed to act, with the specific intent to cause harm to Nader, and thus there is no cap on the amount of punitive damages which may be awarded.

## SIXTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY (against Joshua Filsoof, in his capacity as Executor of the Estate of Fred Filsoof, Does 5-20)

290.   Plaintiff realleges and incorporates all of the above paragraphs as fully set forth herein.

291.   Prior to his death, Fred Filsoof was the trustee of the Nader Trusts. Shortly after Fred's death, Joshua Filsoof wrongfully took, and refused to turn over to Plaintiff, all documents related to the Nader Trusts.

292.   Thus, the current trustee(s) of the Nader Trusts is unknown due to Joshua's wrongful taking and withholding of the documents relating to the Nader Trusts, and Plaintiff names Does 5-20 until such time as the identity of any such trustee(s) can be ascertained. Plaintiff also brings this claim against the Estate of Fred Filsoof, to the extent that such breaches of fiduciary duty were performed by Fred Filsoof as trustee of the Nader Trusts prior to his death.

293.   The trustee of the Nader Trusts owed Plaintiff fiduciary duties, as Plaintiff, and his brother David, are the only beneficiaries of the Nader Trusts.

294.   The trustee(s) of the Nader Trusts intentionally, maliciously, willfully, recklessly, and/or negligently breached their fiduciary duties to Nader by, either

directly or indirectly by consenting to, aiding, abetting, and encouraging and/or facilitating the actions of others in, comingling funds of the Nader Trusts with other personal and/or business funds, using money and property belonging to the Nader Trusts to purchase the NY Condo which was not properly titled in the name of the Nader Trusts, diverting rental income from the NY Condo which properly belongs to the Nader Trusts to other persons and/or entities, refusing to retitle the NY Condo in the name of the Nader Trusts or pay the rental income to the Nader Trusts, despite requests for the same, and refusing to provide Plaintiff with all documents and accountings related to the Nader Trusts.

295.   Plaintiff did not discover these breaches until after the death of Fred Filsoof in 2019, and Plaintiff has been prevented from further discovering facts related to these breaches as a result of the wrongful taking of documents related to the Nader Trusts by Joshua Filsoof.

296.   As a direct and proximate result of the trustee(s)' breach of their fiduciary duties, Nader has sustained substantial damages, including but not limited to the loss of the NY Condo and the rental income derived therefrom (which is at least $6,500 per month), as well as the amounts of any other property that has been improperly removed or converted out of the Nader Trusts.

297.   As alleged herein, trustee(s) were guilty of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, subjecting them to punitive and exemplary damages according to the reprehensibility of their conduct. Further, trustee(s) acted, or failed to act, with the specific intent to cause harm to Nader, and thus there is no cap on the amount of punitive damages which may be awarded.

## SEVENTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH A GIFT OR ECONOMIC EXPECTANCY

**COMPLAINT**

1

**(against Joshua Filsoof, individually and in his capacity as Executor of the**

2

**Estate of Fred Filsoof, Terasa Filsoof, Rachel Filsoof, Does 5-20)**

3
298.   Plaintiff realleges and incorporates all of the above paragraphs as fully

4
set forth herein.

5
299.   As set forth above, in 2017, when Fred Filsoof was in a weak state,

6
Defendants fraudulently induced Fred Filsoof to change his will to exclude Nader

7
and David Filsoof, and to remove them as beneficiaries of the Filsoof Family Trust.

8
300.   Thereafter, and prior to his death in 2019, Fred Filsoof reconciled with

9
Nader and David.

10
301.   A few days before his scheduled surgery in November 2019, Fred told

11
Nader and other third parties that he had changed his will again in 2019 so that all

12
of his children, including Nader and David, were treated equally and would receive

13
20% of his estate upon his death. Fred also explained that he added Nader and David

14
back to the Filsoof Family Trust as beneficiaries in 2019. Thus, Fred explained that

15
he essentially undid the changes he made in 2017 as a result of Defendants' fraud

16
and undue influence.

17
302.   Terasa and Joshua were aware of this new will and that Nader and

18
David had been added back to the Filsoof Family Trust in 2019. After Fred passed

19
away, however, Terasa, Joshua and Rachel Filsoof destroyed the 2019 will and

20
amendments to the Filsoof Family Trust in order to cut out Nader and David from

21
their inheritance. After destroying those documents, Terasa, Joshua and Rachel

22
Filsoof presented the 2017 will and trust amendment, both of which removed Nader

23
and David, as the valid will and trust documents to the probate court—which they

24
knew was false.

25
303.   Although Plaintiff was shocked, as Fred told Plaintiff about the 2019

26
changes he had made to treat everyone equally, Plaintiff did not have access to any

27

_____
**COMPLAINT**

of Fred's documents and had no way of proving the existence of the 2019 will or trust amendment.

304.   After Fred's death, Nader asked for and requested documentation of the 2019 will and 2019 amendment to the Filsoof Family Trust. All such requests were denied, and Joshua told Nader that no such 2019 will or amendment to the Filsoof Family Trust ever existed. These statements were false.

305.   In or around December 2021, Nader learned from a third party that Joshua, Terasa, and Rachel had all destroyed the will and trust documents executed by Fred Filsoof in 2019 which left equal shares of Fred's estate and in the Filsoof Family Trust to Nader, David, Joshua, Rachel and Terasa. The third party confirmed that Joshua, Terasa and Rachel expressly told him that they had destroyed those documents for the express purpose of cutting Nader and David out of their inheritance from Fred, thereby increasing their own shares of such inheritance.

306.   After destroying the 2019 will and trust amendment, Joshua, as Executor of Fred's estate, presented the invalid 2017 will as the final will and testament of Fred Filsoof, and the estate was administered in probate on the 2017 will.

307.   By destroying the 2019 will and falsely proceeding on the 2017 will as valid, Joshua, Terasa and Rachel Filsoof engaged in fraudulent and malicious conduct to divert the perfection of the gift and/or inheritance rightfully belonging to Nader (comprising 20% of Fred's estate).

308.   Likewise, by destroying the 2019 trust amendment that added Nader and David back to the Filsoof Family Trust as equal beneficiaries and falsely claiming that the 2017 amendment removing Nader and David was valid upon Fred's death, Joshua, Terasa and Rachel Filsoof engaged in fraudulent and malicious conduct to divert the perfection of the gift and/or inheritance rightfully belonging to Nader (comprising 20% of the interest in the Filsoof Family Trust).

_____
**COMPLAINT**

309.    Joshua, Terasa and Rachel Filsoof diverted Nadi's rightful inheritance (20% of Fred's estate and 20% interest in the Filsoof Family Trust) to themselves, as Fred's 2017 will removed Nader and David and increased the respective inheritances of Joshua, Terasa, and Rachel, and the 2017 removal of Nader and David from the Filsoof Family Trust increased the remaining beneficiaries (Terasa, Joshua, and Rachel) in a proportionate amount.

310.    Not only did Joshua, Terasa, and Rachel fraudulently induce Fred to execute the documents in 2017 that diverted Nader's inheritance, they also engaged in fraudulent and malicious conduct by then destroying the documents Fred prepared in 2019 that treated all of his heirs, including Plaintiff, equally, for their own benefit and gain.

311.    Plaintiff did not discover that Joshua, Terasa and Rachel destroyed Fred's 2019 will and trust documents until approximately December 2021, when Nader was informed by a third party of Defendants' admissions that they destroyed the 2019 documents and knowingly presented the 2017 will and trust amendments as valid to the probate court, knowing that they were not.

312.    As a direct and proximate result of Defendants' actions, Nader has sustained substantial damages, including but not limited to the loss of the value of his inheritance (20% of Fred's estate), and the value of his 20% interest in the Filsoof Family Trust, which are estimated to be worth at least $10-12 million, if not more.

313.    As alleged herein, Defendants were guilty of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, subjecting them to punitive and exemplary damages according to the reprehensibility of their conduct. Further, Defendants acted, or failed to act, with the specific intent to cause harm to

_____
**COMPLAINT**

1  Nader, and thus there is no cap on the amount of punitive damages which may be

2  awarded.

3  ### EIGHTH CAUSE OF ACTION FOR STATUTORY RELIEF FOR

4  ### MINORITY SHAREHOLDER OPPRESSION

5  ### UNDER O.C.G.A. § 14-2-940(a)(1)

6  **(against Joshua Filsoof, individually and as Trustee of the Filsoof Family Trust, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust and Does 1-20)**

7  314.   Plaintiff realleges and incorporates all of the above paragraphs as

8  though fully set forth herein.

9  315.   Joshua Filsoof has control over CPI, a Georgia corporation. Rachel, his

10  sister, effectively allows Joshua to control her shares and she has acted with full

11  knowledge and consent of Joshua's oppressive conduct toward Nader, as detailed

12  herein.

13  316.   Terasa, as a corporate officer of CPI and the mother of Joshua and

14  Rachel, also exerts control over the affairs of CPI.

15  317.   The Board, in their role, also direct and control CPI's decisions.

16  318.   Joshua (individually and in his capacity as the Trustee of the Filsoof

17  Family Trust), Rachel, Terasa, and the Board have acted and continue to act in a

18  manner which is illegal, oppressive, fraudulent, and unfairly prejudicial to Nader,

19  the de facto minority shareholder.

20  319.   The Defendants' actions violate O.C.G.A. § 14-2-940(a)(1), which

21  provides that a shareholder may petition for relief when "[t]he directors or those in

22  control of the corporation have acted, are acting, or will act in a manner that is

23  illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner, whether in

24  his capacity as shareholder, director, or officer of the corporation."

25  320.   Pursuant to O.C.G.A. § 14-2-941(a), the Court should grant Nader

26  ordinary relief as set forth in the statute, including providing an accounting, the

27

_____
**COMPLAINT**

1  payment of dividends (including back dividends) due to Nader, and an award of

2  damages. Nader also seeks the appointment of a custodian to manage the business

3  and affairs of CPI pending resolution of this lawsuit in order to prevent Defendants

4  from looting CPI's assets in order to further harm Nader.

5     321.  Pursuant to O.C.G.A. § 14-2-941(b), the Court should also award

6  Nader his reasonable expenses (including attorneys' fees and expenses of appraisers

7  and other experts) incurred in this matter.

8     322.  Nader further requests that the Court grant the extraordinary relief

9  permitted under O.C.G.A. § 14-2-942. Specifically, to the extent that the ordinary

10 relief measures stated in O.C.G.A. § 14-2-941 are inadequate or inappropriate,

11 Nader seeks either the dissolution of CPI or a forced purchase of his shares by CPI

12 or one or more of its shareholders for their fair value and on terms determined under

13 the statute. O.C.G.A. § 14-2-942(a). Nader alleges that the remedies provided for in

14 § 14-2-941 are inadequate because the animosity between Nader and Defendants

15 has made continued co-ownership of shares in CPI completely untenable.

16 Defendants have demonstrated their fixation in causing Nader personal and

17 financial harm at any cost, even if it harms CPI. Thus, the Court should dissolve

18 CPI unless one or more of the Defendants purchases Nader's shares for their fair

19 value as set forth by statute.

## NINTH CAUSE OF ACTION FOR CONVERSION UNDER CALIFORNIA LAW

**(Against Joshua Filsoof, individually and in his capacity as Trustee of the Filsoof Family Trust and Executor of the Estate of Fred Filsoof, Terasa Filsoof, Rachel Filsoof, and Does 5-20)**

25     323.  Plaintiff realleges and incorporates all of the above paragraphs as fully

26 set forth herein.

27     324.  Nader is the lawful owner of a 25% stake in CPI.

_____
**COMPLAINT**

325. Joshua Filsoof, individually and in his capacity as Trustee of the Filsoof Family Trust, and Rachel Filsoof have unlawfully converted to themselves monies and distributions from CPI owing to Nader.

326. As set forth herein, Defendants have substantially interfered with Nader's rightful property.

327. Nader has, on multiple occasions, demanded that Joshua, Terasa and Rachel cause CPI to pay the distributions rightfully owed to him, including but not limited to income assigned to him in corporate tax filings, but Defendants have refused. Similarly, Defendants have assigned CPI income to Nader but have failed to pay Nader any such income, and have instead converted it for their own use and benefit.

328. Joshua has further substantially interfered with Nader's property by intentionally and knowingly refusing to provide to Nader his own share certificates, thereby taking possession of and/or preventing Nader from having access to his property.

329. Prior to his death, Fred Filsoof was the trustee of the Nader Trusts. Shortly after Fred's death, Joshua Filsoof wrongfully took, and refused to turn over to Plaintiff, all documents related to the Nader Trusts.

330. Thus, the current trustee(s) of the Nader Trusts is unknown due to Joshua's wrongful taking and withholding of the documents relating to the Nader Trusts, and Plaintiff names Does 5-20 until such time as the identity of any such trustee(s) can be ascertained. Plaintiff also brings this claim against the Estate of Fred Filsoof, to the extent any conversion performed by Fred Filsoof as trustee of the Nader Trusts prior to his death.

331. As alleged above, the trustee(s) of the Nader Trusts comingled funds of the Nader Trusts with other personal and/or business funds, used money and property belonging to the Nader Trusts to purchase the NY Condo which was not

**COMPLAINT**

properly titled in the name of the Nader Trusts, diverted rental income from the NY Condo which properly belongs to the Nader Trusts to other persons and/or entities, refused to retitle the NY Condo in the name of the Nader Trusts or pay the rental income to the Nader Trusts, despite requests for the same, and refused to provide Plaintiff with all documents and accountings related to the Nader Trusts, thereby substantially interfering with Plaintiff's ownership and/or control of the assets in the Nader Trusts and converting such assets for themselves. Alternatively, if Nader and/or David are beneficiaries of the Fred F. Filsoof Trust dated 6/1/1987, which holds title to the NY Condo, then Joshua's refusal to turn over trust documents related thereto, diversion of rental income, and assertion of dominion over the NY Condo are even clearer cases of conversion.

332.   Plaintiff did not discover these acts until after the death of Fred Filsoof in 2019, and Plaintiff has been prevented from further discovering facts related to these breaches as a result of the wrongful taking of documents related to the Nader Trusts by Joshua Filsoof.

333.   As alleged above, Joshua, Terasa and Rachel Filsoof destroyed the 2019 will and falsely proceeded on the 2017 will as valid, which denied Plaintiff his rightful inheritance of 20% of the estate of Fred Filsoof. These actions substantially interfered with Plaintiff's property interests in his inheritance.

334.   Likewise, by destroying the 2019 trust amendment that added Nader and David back to the Filsoof Family Trust as equal beneficiaries and falsely claiming that the 2017 amendment removing Nader and David was valid upon Fred's death, Joshua, Terasa and Rachel Filsoof substantially interfered with Plaintiff's property interests as a rightful 20% beneficiary of the Filsoof Family Trust.

335.   Plaintiff did not discover that Joshua, Terasa and Rachel destroyed Fred's 2019 will and trust documents until approximately December 2021, when

_____
**COMPLAINT**

1    Nader was informed by a third party of Defendants' admissions that they destroyed

2    the 2019 documents and knowingly presented the 2017 will and trust amendments

3    as valid to the probate court, knowing that they were not.

4        336.   Defendants took all of the above actions knowingly and intentionally

5    in order to deprive Plaintiff of the rightful possession of his property.

6        337.   Nader did not consent to these actions.

7        338.   This conduct has caused Nader substantial damages.

8        339.   Defendants' actions were a substantial factor in causing Nader's harm.

9        340.   As alleged herein, Defendants were guilty of oppression, fraud, or

10   malice, subjecting them to punitive and exemplary damages according to the

11   reprehensibility of their conduct.

12            **TENTH CAUSE OF ACTION FOR CIVIL CONSPIRACY**

13                     **To commit Counts 5-7, 9, 12, 13**

14   **(against Joshua Filsoof (individually and as Trustee of the Filsoof Family**

15           **Trust), Rachel Filsoof, Terasa Filsoof, and Does 1-20)**

16       341.   Plaintiff realleges and incorporates all of the above paragraphs as

17   though fully set forth herein.

18       342.   Joshua, individually and as Trustee of the Filsoof Family Trust, Rachel

19   Filsoof, Terasa Filsoof, and/or the Board acted in concert to deny Nader corporate

20   distributions, improperly deny him access to the corporate books and records,

21   improperly undervalue his shares of the company and offer him a buyout offer at an

22   artificially low price, and impose unfair tax liability upon Nader, which actions

23   constitute a breach of these Defendants' fiduciary duties, conversion, and fraud, as

24   alleged herein.

25       343.   Each Defendant was aware of each other Defendant's plan to engage

26   in these tortious acts.

27

_____
**COMPLAINT**

344.   Each Defendant agreed with each other Defendant and intended that these tortious acts be committed.

345.   This conduct has caused Nader substantial damages. Defendants' conduct was a substantial factor in causing Nader's harm.

346.   As alleged herein, Defendants were guilty of oppression, fraud, or malice, subjecting them to punitive and exemplary damages according to the reprehensibility of their conduct.

## ELEVENTH CAUSE OF ACTION FOR RELIEF PERMITTING INSPECTION OF CORPORATE RECORDS

### (against Coordinated Properties, Inc.)

347.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

348.   On January 11, 2022, April 23, 2024, and June 21, 2024, Nader or his agent demanded, in writing, an inspection of the corporate books and records of CPI pursuant to O.C.G.A. § 14-2-1602, which is his right as a shareholder of CPI.

349.   Each of those demands included a specific list of documents to be inspected, including many of the documents specifically listed for inspection in O.C.G.A. § 14-2-1602, and explicitly stated the good-faith purpose of the inspection.

350.   CPI, at the direction of Joshua Filsoof, Terasa Filsoof, and/or the Board, has steadfastly refused to allow any such inspection.

### *Demand for inspection of records listed in O.C.G.A. § 14-2-1602(a)*

351.   Nader has requested multiple times to inspect the corporate records available to him under § 14-2-1602(a), which are: (a) the articles of incorporation or restated articles of incorporation and all amendments to them currently in effect; (b) CPI's bylaws or restated bylaws and all amendments to them currently in effect; (c) resolutions adopted by either CPI's shareholders or Board of Directors

_____
**COMPLAINT**

increasing or decreasing the number of directors, the classification of directors, if any, and the names and addresses of all members of the board of directors; (d) Resolutions adopted by CPI's Board of Directors creating one or more classes or series of shares, and fixing their relative rights, preferences, and limitations, and any resolutions by the Board of Directors that affect the size of the Board; (e) the minutes of all shareholders' meetings, executed waivers of notice of meetings, and executed consents evidencing all action taken by shareholders without a meeting, for the past three years; (f) all communications in writing or by electronic transmission to shareholders generally within the last three years, including the financial statements furnished for the past three years under Code Section 14-2-1620; (g) a list of the names and addresses of its current directors and officers; and (h) its most recent annual registration delivered to the Secretary of State.

352.   Pursuant to O.C.G.A. § 14-2-1602(b), Nader has a right to inspect and copy any and all of the documents listed in subsection (a) without any showing of good faith.

353.   In each of his written demands, Nader met all of the statutory requirements to be allowed inspection of the documents listed in subsection (a) because he gave CPI advance written notice of his demand. See O.C.G.A. § 14-2-1602(b).

354.   Yet CPI, on the direction of Joshua Filsoof, Terasa Filsoof, and/or the Board, has repeatedly refused to provide Nader with the documents that he is entitled to as a shareholder under § 14-2-1602(a) because, they claim, he has not offered a good-faith reason to do so, an excuse which is not supported by Georgia law.

### Demand for inspection of records listed in O.C.G.A. § 14-2-1602(c)

355.   Nader has requested multiple times to inspect the corporate records available to him under § 14-2-1602(c), which are: (1) excerpts from minutes of

_____
**COMPLAINT**

meetings of the Board of Directors, records of any action of a committee of the Board of Directors while acting in place of the Board of Directors on behalf of the corporation, minutes of any meetings of the shareholders, and records of actions taken by the shareholders or Board of Directors without a meeting; (b) the accounting records of CPI; and (c) the record of shareholders.

356.    In each of his written demands, Nader met all of the statutory requirements to be allowed inspection of the documents listed in subsection (c) because he: (a) made a written demand to do so at least five business days before the inspection; (b) his demand was made in good faith and for a proper purpose that was reasonably relevant to his legitimate interest as a shareholder; (c) he described with particularity his purpose and the records he desired to inspect; (d) the records sought were directly connected to that purpose; and (e) the records would only be used for that stated purpose. See O.C.G.A. § 14-2-1602(d).

357.    Yet CPI, on the direction of Joshua Filsoof, Terasa Filsoof, and/or the Board, has repeatedly refused to provide Nader with the documents that he is entitled to as a shareholder under § 14-2-1602(c).

358.    CPI, on the direction of Joshua Filsoof, Terasa Filsoof, and/or the Board, has claimed that Nader did not have a good faith reason for inspection of the documents listed under subsection (c), but this was a pretense and an excuse to deny him his rights of inspection under Georgia law.

359.    Pursuant to O.C.G.A. § 14-2-1604, Nader requests that this Court enter an order permitting inspection and copying of the records that he is entitled to under O.C.G.A. § 14-2-1602, and that the court resolve this matter on an expedited basis.

## TWELFTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT UNDER CALIFORNIA LAW

**(Against Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and Does 1-20)**

_____
**COMPLAINT**

360.   Plaintiff realleges and incorporates all of the above paragraphs as though fully set forth herein.

361.   As described above, Defendants owed Plaintiff fiduciary duties.

362.   As generally described herein, Defendants suppressed, concealed and/or failed to disclose material facts to Plaintiffs, including, but not limited to, the documents and information related to the financial condition of CPI and the valuation of Plaintiff's shares, requested by Plaintiff and/or his counsel on multiple occasions, including but not limited to formal inspection demands on January 11, 2022, April 23, 2024, and June 21, 2024.

363.   Despite repeated requests made by Plaintiff, Defendants have failed to deliver to Plaintiff financial and corporate information related to CPI, intentionally concealing material facts regarding the actual financial performance, assets, and liabilities of CPI, as well as the true valuation of Plaintiff's shares of CPI stock.

364.   In the documents and information that Defendants did deliver to Plaintiff, including but not limited to CPI's 2022 balance sheet and 2022 profit and loss statement attached to its May 7, 2024 correspondence, the K-1 statements provided to Plaintiff in 2021, 2022, and 2023, the December 2, 2021 email from Joshua Filsoof and accompanying Bennett Thrasher Report, the December 3, 2021 email from Joshua Filsoof, and the October 17, 2022 email from Joshua Filsoof, contained information related to the financial condition of CPI, the value of Plaintiff's shares in CPI, and CPI's imposition of tax liability without distributions that was false, misleading, and/or incorrect.

365.   Defendants intentionally concealed and/or omitted material facts that were known only to Defendants and that Plaintiffs could not have reasonably discovered, such as the true, accurate, and full financial statements of CPI necessary for Plaintiff to conduct an independent valuation of CPI, as well as verify the tax distributions or other compensation provided to other shareholders. Despite requests

79

_____
**COMPLAINT**

for such information, Defendants have actively concealed such information from Plaintiff.

366.   Defendants intentionally failed to disclose these facts, which were known only to Defendants and others acting in concert with Defendants, and which Plaintiff could not have discovered.

367.   Defendants prevented Plaintiff from discovering these facts by keeping them concealed from Plaintiff and refusing to provide information and documents requested by Plaintiff. Indeed, Plaintiff still does not have any way to accurately value his shares in CPI, which is Defendants' goal in forcing him out of the company.

368.   Defendants also owed Plaintiff a legal duty of disclosure because (i) Defendants had exclusive knowledge of material facts not known to the Plaintiff; (ii) Defendants owed Plaintiff fiduciary duties; and/or (iii) Defendants actively concealed material facts from the Plaintiff.  This duty to disclose arose from the relationship between the parties, as Defendants owe fiduciary duties to Plaintiff in their respective capacities as officers, managers, and directors of CPI and Trustee of the Filsoof Family Trust.  As a result, Defendants were under a duty of disclosure to Plaintiff.

369.   Plaintiff did not know of the concealed facts.

370.   Defendants intended to deceive Plaintiff by concealing these facts.

371.   Had the omitted information been disclosed to Plaintiff, he would have behaved differently. Namely, had Plaintiff known the true value of his shares or the financial condition of CPI, he would have been able to legitimately challenge Defendants' computation of bogus tax liabilities to Plaintiff. However, to date, Plaintiff has been unable to do so, as he does not have any accurate financial information related to CPI, and Defendants continue to conceal such information. As a result, Plaintiff is facing over $1 million in tax liability, interest, and penalties.

_____
**COMPLAINT**

While Nader has received provisional relief from federal taxes due to retention of tax counsel, he still has outstanding state tax debt which compounds daily and has not been reversed.  Further, if CPI wants to sabotage Nader's valuation or tax position further it can continue to misrepresent facts to the IRS and convince it that a reassessment of the reversed tax liability is necessary, and the IRS has not released the liens against Nader. As a direct and proximate result of Defendants' concealment, Plaintiffs have been harmed, the exact amount to be proven at trial. Nader's state taxes still reflect CPI's erroneously filed Federal schedules and he continues to suffer as a result of state taxes which remain unadjusted notwithstanding the temporary relief that Nader has received from the IRS.

372.   Further, had Defendants disclosed the true and accurate financial information of CPI, Plaintiff would have been able to present a true valuation of his shares and proposed a buyout offer based upon such valuation. Defendants' fraud has utterly prevented Plaintiff from being able to do so.

373.   Defendants' concealment was a substantial factor in causing Plaintiffs' harm, in an amount to be proved at trial.

374.   The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## THIRTEENTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD
### (Cal. Civ. Code, § 1573)

**(Against Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and Does 1-20)**

375.   Plaintiff realleges and incorporates all of the above paragraphs as though fully set forth herein.

376.   As described above, Defendants owed Plaintiff fiduciary duties.

_____
**COMPLAINT**

377.   As generally described herein, Defendants suppressed, concealed and/or failed to disclose material facts to Plaintiffs, including, but not limited to, the documents and information related to the financial condition of CPI and the valuation of Plaintiff's shares, requested by Plaintiff and/or his counsel on multiple occasions, including but not limited to formal inspection demands on January 11, 2022, April 23, 2024, and June 21, 2024.

378.   Despite repeated requests made by Plaintiff, Defendants have failed to deliver to Plaintiff financial and corporate information related to CPI, intentionally concealing material facts regarding the actual financial performance, assets, and liabilities of CPI, as well as the true valuation of Plaintiff's shares of CPI stock.

379.   In the documents and information that Defendants did deliver to Plaintiff, including but not limited to CPI's 2022 balance sheet and 2022 profit and loss statement attached to its May 7, 2024 correspondence, the K-1 statements provided to Plaintiff in 2021, 2022, and 2023, the December 2, 2021 email from Joshua Filsoof and accompanying Bennett Thrasher Report, the December 3, 2021 email from Joshua Filsoof, and the October 17, 2022 email from Joshua Filsoof, contained information related to the financial condition of CPI, the value of Plaintiff's shares in CPI, and CPI's imposition of tax liability without distributions that was false, misleading, and/or incorrect.

380.   Thus, Defendants misled Plaintiff by failing to provide all necessary and accurate information about the financial condition of CPI and the valuation of his shares, and providing Plaintiff with false and/or misleading information about the financial condition of CPI and/or the valuation of Plaintiff's shares and/or the imposition of tax liability without distributions upon Plaintiff. Defendants have also failed to account for the corporate income of CPI attributed to Nader in corporate tax filings or to pay the income over to him.

**COMPLAINT**

381.  Defendants knew or should have known that such information was misleading, inaccurate, and/or false, and that their refusal to provide full, complete and accurate information about the financial condition of CPI and the valuation of Plaintiff's shares and tax liabilities without distributions would mislead and/or harm Plaintiff.

382.  Plaintiff was harmed as a result of Defendants' actions, in an amount to be proven at trial.

383.  Defendants' conduct was a substantial factor in causing Plaintiff's harm.

384.  The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## FOURTEENTH CAUSE OF ACTION FOR
## ACCOUNTING UNDER CALIFORNIA LAW
### (Against All Defendants)

385.  Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

386.  Defendants were obligated to provide to Plaintiffs with the books and records of CPI requested by Plaintiff through his formal inspection demands made on January 11, 2022, April 23, 2024, and June 21, 2024. Such books and records related to the financial condition of CPI, the valuation of Plaintiff's shares, and the imposition of tax liability without distributions upon Plaintiff.

387.  Despite demand therefor, Defendants have failed and refused, and continue to fail and refuse, to provide Plaintiff with proper and accurate financial information related to CPI that Plaintiff is entitled to. Instead, Defendants have intentionally provided false, misleading, inaccurate, and fraudulent documents and information designed to force Plaintiff to sell his shares in CPI for well below

_____
**COMPLAINT**

market value while bearing an unfair tax liability that no other shareholders are subject to. Defendants have also failed to account for the corporate income of CPI attributed to Nader in corporate tax filings or to pay the income over to him.

388.   The false and fraudulent documents provided by Defendant, including the Bennett Thrasher report purporting to value Plaintiff's shares in CPI at an unfairly low price, entitle Plaintiff to an accurate and truthful accounting allowing Plaintiff to perform his own independent valuation of his shares.

389.   Plaintiff is entitled to an order requiring CPI, and to the extent necessary, the other Defendants, to provide their complete books and records of account in all details.

390.   Further, as the beneficiary of the Nader Trusts, Plaintiff is entitled to a full accounting of all assets held by the Nader Trusts as well as transactions and financial statements relating to the Nader Trusts. As a result of Joshua Filsoof's wrongful taking of all documents related to the Nader Trusts, Plaintiff has no other means of obtaining such an accounting.

## FIFTEENTH CAUSE OF ACTION FOR VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ*

### (Against All Defendants)

391.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

392.   As described more fully above, Defendants have knowingly performed acts, including but not limited to, fraudulently concealing material facts related to CPI's financial condition, the valuation of Plaintiff's shares and tax liability, providing false, misleading, incorrect, and fraudulent information and documents regarding the same, breached their fiduciary duties to Plaintiff, engaged in constructive fraud, and have engaged in an unlawful scheme designed to squeeze out Plaintiff by forcing him to sell his shares in CPI at a fire sale price in order to

avoid further tax liability wrongfully imposed upon Plaintiff and to unfairly benefit themselves and punish Plaintiff. Defendants intentionally concealed and/or omitted material facts that were known only to Defendants and that Plaintiffs could not have reasonably discovered, such as the true, accurate, and full financial statements of CPI necessary for Plaintiff to conduct an independent valuation of CPI, as well as verify the tax liabilities and distributions, dividends, or other compensation provided to the other shareholders. Defendants have also failed to account for the corporate income of CPI attributed to Nader in corporate tax filings or to pay the income over to him. Defendants have also recorded more than $4.3 million in alleged shareholder loans from Nader to CPI, all of which are false and designed to fraudulently misstate the accounting records of CPI in order to fraudulently under value Nader's shares in CPI. Despite requests for such information, Defendants have actively concealed such information from Plaintiff.

393.    Defendants knowingly committed these acts in order to unlawfully deprive Plaintiff of his financial entitlements (including but not limited to dividends and tax distributions) and cause Plaintiff financial harm by imposing an unfair tax liability on Plaintiff in order to pressure him into selling his shares at an unfair fire sale price and punish Plaintiff. These acts constitute unlawful, unfair and/or fraudulent business practices and unfair competition under Sections 17200, et seq., of the California Business and Professions Code ("UCL").

394.    Specifically, Defendants' tortious conduct, including but not limited to breaches of fiduciary duty, conversion, civil conspiracy, fraudulent concealment, constructive fraud, tortious interference, and violation of the Federal RICO statute, as described in more detail above, were "unlawful" under the UCL.

395.    Defendants' conduct was fraudulent as it constituted fraudulent concealment and/or constructive fraud, as described in more detail above.

_____
**COMPLAINT**

396.   Defendants' scheme to squeeze out Nader by putting financial pressure on him via the imposition of corporate tax liability without payment of income, dividends, distributions or other benefits provided to the other shareholders, in order to force him to sell his shares for a fraction of their true worth is clearly "unfair" under the UCL. Defendants' conduct is immoral, unethical, oppressive, and unscrupulous, as it targeted Nader to intentionally cause him harm in a manner unique to him, while the other shareholders have not suffered such harm and failed to treat him fairly as the rest of the shareholders were treated. Indeed, while Nader is facing crippling debt at the hands of Defendants, they have been spending funds that should have gone to Nader on luxury cars, trips, designer clothes, and cosmetic surgery.

397.   As a result of such conduct, Plaintiff has suffered, and will continue to suffer, irreparable harm by Defendants' unfair, unlawful and/or fraudulent practices, including but not limited to, harm to his reputation, goodwill, and stature in the community, for which there is no adequate remedy at law, thereby justifying injunctive relief. Until and unless injunctive relief is granted, Defendants will be unjustly enriched, which should be disgorged pursuant to allowable remedies under Sections 17200, et seq., of the California Business and Professions Code.

## SIXTEENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT

**(Against Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and Does 1-20)**

398.   Plaintiff realleges and incorporates all of the above paragraphs as though fully set forth herein.

399.   As alleged herein, Defendants have received benefits and have unjustly retained such benefits at the expense of Plaintiff.

**COMPLAINT**

400.   By withholding rightful distributions and undervaluing Nader's shares in CPI, the Defendants unjustly enriched themselves at Nader's expense. This enrichment occurred through the misallocation of corporate profits and assets that should have been distributed equitably among all shareholders. Defendants have transferred property from CPI to entities also owned or controlled by members of the majority bloc for zero consideration in order to privately benefit Defendants (including Sherkat Nafis, Coordinated Capital and Laurelbrook) and transferred such funds from those entities to themselves, made loans from CPI to Defendants or their trusts, with no supporting underlying loan documents on unfair and unreasonable terms, failed to account for the corporate income of CPI attributed to Nader in corporate tax filings or paid the income over to him, and by orchestrated the payment of distributions, dividends, salaries, or other monies to the majority shareholder bloc so they would not be burdened by pass-through tax liabilities. Defendants have also been unjustly enriched as a result of their destruction of the 2019 will and amendment to the Filsoof Family Trust that included Nader and David as equal beneficiaries. Defendants instead proceeded to probate on the 2017 will and trust amendments that they had fraudulently induced and which they knew were superseded by the 2019 documents in order to intentionally deny Nader his rightful inheritance and increase their own personal entitlements unfairly by tens of millions of dollars.

401.   These benefits were received by Defendants at Plaintiff's expense, and therefore constitute unjust enrichment.

402.   As a result, Plaintiff seeks to recover the amount by which Defendants have been unjustly enriched, in an amount to be determined at trial.

**SEVENTEENTH CAUSE OF ACTION FOR BREACH OF CONTRACT**

**(Against Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, and Does 1-20)**

_____
**COMPLAINT**

403.   Plaintiff realleges and incorporates all of the above paragraphs as though fully set forth herein.

404.   CPI's Bylaws (**Exhibit 1**) constitute a contract between CPI and its shareholders, including Plaintiff.

405.   Joshua Filsoof, Rachel Filsoof, Terasa Filsoof, the Filsoof Family Trust, as shareholders, officers, and/or directors of CPI, breached CPI's Bylaws as set forth herein.

406.   Defendants breached sections 2.2 and 2.4 of the Bylaws by failing to provide notice of CPI's annual shareholder meetings to Plaintiff since 2021. The last annual shareholders' meeting that Plaintiff was given notice for was held on April 5, 2021. Plaintiff was entitled to vote at any annual meeting of the shareholders, pursuant to section 2.6 of the Bylaws and Georgia law.

407.   Defendants breached section 8.1 of the Bylaws by failing to permit Plaintiff to inspect CPI's books and records in accordance with Georgia law.

408.   Defendants breached section 8.4 of the Bylaws by failing to provide Plaintiff with the financial statements set forth therein, which were required to be provided to Plaintiff no later than the close of each fiscal year, and prior to the annual meeting of the shareholders. Defendants have not provided such records as required by section 8.4 since approximately 2021.

409.   Defendants also breached section 8.4 of the bylaws, which states that CPI "promptly shall mail to any shareholder of record a copy of the most recent balance sheet and profit and loss statement." Despite making several requests, including three inspection demands sent by counsel, Defendants have failed to provide such documents at all in response to Plaintiff's requests for the same, in breach of the Bylaws.

410.   Plaintiff has performed all obligations owed under the Bylaws except  those obligations that Plaintiff was prevented or excused from performing.

_____
**COMPLAINT**

411.    As a direct and proximate result of Defendants' breaches of the Bylaws, Plaintiff has suffered damages in an amount to be proven at trial.

412.    The injury suffered by Plaintiff was unique to Plaintiff, as Plaintiff is the only shareholder who has been precluded from attending annual shareholder meetings and denied financial information of CPI. Further, Plaintiff's contractual rights to receive notice of the annual shareholders' meeting and to receive financial information of CPI exist independently of any right of the corporation. As a result, Plaintiff has properly brought this as a direct rather than a derivative claim, as the harm Plaintiff suffered was suffered only by him, not by any other shareholders or CPI.

413.    In addition to damages, Plaintiff seeks specific performance, requiring Defendants to comply with the bylaws set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Nader Filsoof prays as follows:

1.    Compensatory and other damages in an amount to be determined at trial, but exceeding at least $30 million, with the amount on any award for Plaintiff's federal and state RICO claims to be trebled;

2.    For punitive and exemplary damages on those causes of action which support such an award, including pursuant to O.C.G.A. § 51-12-5.1; GA Code § 51-12-5.1; Cal. Civ. Code § 3294;

3.    Restitutionary damages consisting of the amount by which Defendants have been unjustly enriched, in an amount to be determined at trial;

4.    For attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Defendants have acted in bad faith, have been stubbornly litigious and have caused Plaintiff unnecessary trouble and expense; or pursuant to O.C.G.A. § 14-2-941(b), 18 U.S.C. § 1964, or any alternative;

_____
**COMPLAINT**

5.    For an order permitting Nader to inspect all books and records of Coordinated Properties allowable under O.C.G.A. §§ 14-2-1602; 14-2-1604;

6.    For an order compelling Defendants to produce an accounting pursuant to O.C.G.A. § 14-2-941(a);

7.    For an order appointing a custodian to manage the business and affairs of CPI pending resolution of this lawsuit in order to prevent Defendants from misappropriating CPI's assets in order to further harm Nader, pursuant to O.C.G.A. § 14-2-941(a), or any other alternative;

8.    For an order dissolving CPI unless one or more Defendants purchase Plaintiff's shares at a fair price pursuant to O.C.G.A. § 14-2-942;

9.    For an order compelling Defendants to account to Plaintiff all documents and information necessary for Plaintiff to complete a valuation of his shares in CPI;

10.    For an order establishing a constructive trust over the property of CPI and/or Defendants which is the subject of this action and the result of Defendants' fraud, breach of fiduciary duty, and/or unjust enrichment;

11.    For an order of specific performance of those sections of the Bylaws which Defendants have breached;

12.    For a temporary restraining order and/or preliminary and/or permanent injunction enjoining permanent injunction enjoining Defendants, its directors, officers, agents, and employees, and those acting in privity or in concert with it, and its partners, subsidiaries, divisions, successors, and assigns, from further acts of unfair, unlawful or fraudulent conduct in violation of Sections 17200, et seq., of the California Business and Professions Code;

13.    For a judgment that Plaintiff be awarded other relief including but not limited to disgorgement of any amounts by which Defendants have been unjustly enriched as a result of their wrongful conduct;

**COMPLAINT**

14.    For costs of suit;

15.    For pre-judgment and post-judgment interest on any award; and

16.    For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff Nader Filsoof, and hereby demands a jury trial in the above matter.

Dated: November 12, 2025              **SEDDIGH ARBETTER LLP**


By:  __/s/ Alicia M. Veglia_____
        Alicia M. Veglia
        *Attorneys for* Plaintiff Nader Filsoof

91

_____
**COMPLAINT**